SCHNEIDERMAN *v.* UNITED STATES.

No. 2. Argued November 9, 1942. Reargued March 12, 1943.—
Decided June 21, 1943.

*Mr. Wendell L. Willkie,* with whom *Mrs. Carol King* and *Mr. Carl M. Owen* were on the briefs, for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Berge,* and *Messrs. Oscar A. Provost, John Ford Baecher* and *Richard S. Salant* were on the briefs, for the United States.

*Pearl M. Hart* filed a brief on behalf of the American Committee for Protection of Foreign Born, as *amicus curiae,* urging reversal.

MR. JUSTICE MURPHY delivered the opinion of the Court.

We brought this case here on certiorari, 314 U. S. 597, because of its importance and its possible relation to freedom of thought. The question is whether the naturalization of petitioner, an admitted member of the Communist Party of the United States, was properly set aside by the courts below some twelve years after it was granted. We agree with our brethren of the minority that our relations with Russia, as well as our views regarding its government and the merits of Communism are immaterial to a decision of this case. Our concern is with what Congress

meant by certain statutes and whether the Government has proved its case under them.

While it is our high duty to carry out the will of Congress, in the performance of this duty we should have a jealous regard for the rights of petitioner. We should let our judgment be guided so far as the law permits by the spirit of freedom and tolerance in which our nation was founded, and by a desire to secure the blessings of liberty in thought and action to all those upon whom the right of American citizenship has been conferred by statute, as well as to the native born. And we certainly should presume that Congress was motivated by these lofty principles.

We are directly concerned only with the rights of this petitioner and the circumstances surrounding his naturalization, but we should not overlook the fact that we are a heterogeneous people. In some of our larger cities a majority of the school children are the offspring of parents only one generation, if that far, removed from the steerage of the immigrant ship, children of those who sought refuge in the new world from the cruelty and oppression of the old, where men have been burned at the stake, imprisoned, and driven into exile in countless numbers for their political and religious beliefs. Here they have hoped to achieve a political status as citizens in a free world in which men are privileged to think and act and speak according to their convictions, without fear of punishment or further exile so long as they keep the peace and obey the law.

This proceeding was begun on June 30, 1939, under the provisions of § 15 of the Act of June 29, 1906, 34 Stat. 596, to cancel petitioner's certificate of citizenship granted in 1927. This section gives the United States the right and the duty to set aside and cancel certificates of citizenship on the ground of "fraud" or on the ground that

they were "illegally procured." [1] The complaint charged that the certificate had been illegally procured in that petitioner was not, at the time of his naturalization, and during the five years preceding his naturalization "had not behaved as, a person attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States,[2] but in truth and in fact during all of said times, respondent [petitioner] was a member of and affiliated with and believed in and supported the principles of certain or-

---

[1] At the time this proceeding was started this section read in part as follows:

"It shall be the duty of the United States district attorneys for the respective districts, or the Commissioner of Immigration and Naturalization or Deputy Commissioner of Immigration and Naturalization, upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured . . . " 8 U. S. C. § 405.

This provision is continued in substance by § 338 of the Nationality Act of 1940, 54 Stat. 1137, 1158, 8 U. S. C. § 738.

[2] Section 4 of the Act of 1906 provided:

"Fourth. It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. In addition to the oath of the applicant, the testimony of at least two witnesses, citizens of the United States, as to the facts of residence, moral character, and attachment to the principles of the Constitution shall be required, and the name, place of residence, and occupation of each witness shall be set forth in the record." 34 Stat. 598; 8 U. S. C. § 382.

ganizations then known as the Workers (Communist) Party of America and the Young Workers (Communist) League of America, whose principles were opposed to the principles of the Constitution of the United States and advised, advocated and taught the overthrow of the Government, Constitution and laws of the United States by force and violence." The complaint also charged fraudulent procurement in that petitioner concealed his Communist affiliation from the naturalization court. The Government proceeds here not upon the charge of fraud but upon the charge of illegal procurement.

This is not a naturalization proceeding in which the Government is being asked to confer the privilege of citizenship upon an applicant. Instead the Government seeks to turn the clock back twelve years after full citizenship was conferred upon petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from that status. In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof. So, whatever may be the rule in a naturalization proceeding (see *United States* v. *Manzi*, 276 U. S. 463, 467), in an action instituted under § 15 for the purpose of depriving one of the precious right of citizenship previously conferred we believe the facts and the law should be construed as far as is reasonably possible in favor of the citizen. Especially is this so when the attack is made long after the time when the certificate of

citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness. It is not denied that the burden of proof is on the Government in this case. For reasons presently to be stated this burden must be met with evidence of a clear and convincing character that when citizenship was conferred upon petitioner in 1927 it was not done in accordance with strict legal requirements.

We are dealing here with a court decree entered after an opportunity to be heard. At the time petitioner secured his certificate of citizenship from the federal district court for the Southern District of California notice of the filing of the naturalization petition was required to be given ninety days before the petition was acted on (§ 6 of the Act of 1906), the hearing on the petition was to take place in open court (§ 9), and the United States had the right to appear, to cross-examine petitioner and his witnesses, to introduce evidence, and to oppose the petition (§ 11). In acting upon the petition the district court exercised the judicial power conferred by Article III of the Constitution, and the Government had the right to appeal from the decision granting naturalization. *Tutun* v. *United States,* 270 U. S. 568. The record before us does not reveal the circumstances under which petitioner was naturalized except that it took place in open court. We do not know whether or not the Government exercised its right to appear and to appeal. Whether it did or not, the hard fact remains that we are here re-examining a judgment, and the rights solemnly conferred under it.

This is the first case to come before us in which the Government has sought to set aside a decree of naturalization years after it was granted on a charge that the finding of attachment was erroneous. Accordingly for the first time we have had to consider the nature and scope of the Government's right in a denaturalization proceeding to re-examine a finding and judgment of attachment

upon a charge of illegal procurement. Because of the view we take of this case we do not reach, and therefore do not consider, two questions which have been raised concerning the scope of that right.

The first question is whether, aside from grounds such as lack of jurisdiction or the kind of fraud which traditionally vitiates judgments, cf. *United States* v. *Throckmorton,* 98 U. S. 61; *Kibbe* v. *Benson,* 17 Wall. 624, Congress can constitutionally attach to the exercise of the judicial power under Article III of the Constitution, authority to re-examine a judgment granting a certificate of citizenship after that judgment has become final by exhaustion of the appellate process or by a failure to invoke it.[3]

The second question is whether under the Act of 1906 as it was in 1927 the Government, in the absence of a claim of fraud and relying wholly upon a charge of illegal procurement, can secure a *de novo* re-examination of a naturalization court's finding and judgment that an applicant for citizenship was attached to the principles of the Constitution.

We do not consider these questions. For though we assume, without deciding, that in the absence of fraud a certificate of naturalization can be set aside under § 15 as "illegally procured" because the finding as to attachment would later seem to be erroneous, we are of the

---

[3] Since 1790 Congress has conferred the function of admitting aliens to citizenship exclusively upon the courts. In exercising their authority under this mandate the federal courts are exercising the judicial power of the United States, conferred upon them by Article III of the Constitution. *Tutun* v. *United States,* 270 U. S. 568. For this reason it has been suggested that a decree of naturalization, even though the United States does not appear, cannot be compared (as was done in *Johannessen* v. *United States,* 225 U. S. 227, 238) to an administrative grant of land or of letters patent for invention, and that the permissible area of re-examination is different in the two situations.

opinion that this judgment should be reversed. If a finding of attachment can be so reconsidered in a denaturalization suit, our decisions make it plain that the Government needs more than a bare preponderance of the evidence to prevail. The remedy afforded the Government by the denaturalization statute has been said to be a narrower one than that of direct appeal from the granting of a petition. *Tutun* v. *United States,* 270 U. S. 568, 579; cf. *United States* v. *Ness,* 245 U. S. 319, 325. *Johannessen* v. *United States* states that a certificate of citizenship is "an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured. It is in this respect closely analogous to a public grant of land, . . ." 225 U. S. 227, 238. See also *Tutun* v. *United States, supra.* To set aside such a grant the evidence must be "clear, unequivocal, and convincing"—"it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt." *Maxwell Land-Grant Case,* 121 U. S. 325, 381; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 300; cf. *United States* v. *Rovin,* 12 F. 2d 942, 944. See Wigmore, Evidence, (3d Ed.) § 2498. This is so because rights once conferred should not be lightly revoked. And more especially is this true when the rights are precious and when they are conferred by solemn adjudication, as is the situation when citizenship is granted. The Government's evidence in this case does not measure up to this exacting standard.

Certain facts are undisputed. Petitioner came to this country from Russia in 1907 or 1908 when he was approximately three. In 1922, at the age of sixteen, he became a charter member of the Young Workers (now Communist) League in Los Angeles and remained a member until 1929 or 1930. In 1924, at the age of eighteen, he filed his declaration of intention to become a citizen. Later in the same year or early in 1925 he became a member of the

126

Workers Party, the predecessor of the Communist Party of the United States. That membership has continued to the present. His petition for naturalization was filed on January 18, 1927, and his certificate of citizenship was issued on June 10, 1927, by the United States District Court for the Southern District of California. He had not been arrested or subjected to censure prior to 1927,[4] and there is nothing in the record indicating that he was ever connected with any overt illegal or violent action or with any disturbance of any sort.

For its case the United States called petitioner, one Humphreys, a former member of the Communist Party, and one Hynes, a Los Angeles police officer formerly in charge of the radical squad, as witnesses, and introduced in evidence a number of documents. Petitioner testified on his own behalf, introduced some documentary evidence, and read into the record transcripts of the testimony of two university professors given in another proceeding.

Petitioner testified to the following: As a boy he lived in Los Angeles in poverty-stricken circumstances and joined the Young Workers League to study what the principles of Communism had to say about the conditions of society. He considered his membership and activities in the League and the Party during the five-year period between the ages of sixteen and twenty-one before he was naturalized, as an attempt to investigate and study the causes and reasons behind social and economic conditions. Meanwhile he was working his way through night high school and college. From 1922 to about 1925 he was "educational director" of the League. The duties of this non-salaried position were to organize classes, open to the public, for the study of Marxist theory, to register students and to send out notices for meetings; petitioner did no

---

[4] The record contains nothing to indicate that the same is not true for the period after 1927.

teaching. During 1925 and 1926 he was corresponding secretary of the Party in Los Angeles; this was a clerical, not an executive position. In 1928 he became an organizer or official spokesman for the League. His first executive position with the Party came in 1930 when he was made an organizational secretary first in California, then in Connecticut and later in Minnesota where he was the Communist Party candidate for governor in 1932. Since 1934 he has been a member of the Party's National Committee. At present he is secretary of the Party in California.

Petitioner testified further that during all the time he has belonged to the League and the Party he has subscribed to the principles of those organizations. He stated that he "believed in the essential correctness of the Marx theory as applied by the Communist Party of the United States," that he subscribed "to the philosophy and principles of Socialism as manifested in the writings of Lenin," and that his understanding and interpretation of the program, principles and practice of the Party since he joined "were and are essentially the same as those enunciated" in the Party's 1938 Constitution. He denied the charges of the complaint and specifically denied that he or the Party advocated the overthrow of the Government of the United States by force and violence, and that he was not attached to the principles of the Constitution. He considered membership in the Party compatible with the obligations of American citizenship. He stated that he believed in retention of personal property for personal use but advocated social ownership of the means of production and exchange, with compensation to the owners. He believed and hoped that socialization could be achieved here by democratic processes but history showed that the ruling minority has always used force against the majority before surrendering power. By dictatorship of the proletariat petitioner meant that the "majority of the people

shall really direct their own destinies and use the instrument of the state for these truly democratic ends." He stated that he would bear arms against his native Russia if necessary.

Humphreys testified that he had been a member of the Communist Party and understood he was expelled because he refused to take orders from petitioner. He had been taught that present forms of government would have to be abolished "through the dictatorship of the proletariat" which would be established by a "revolutionary process." He asserted that the program of the Party was the socialization of all property without compensation. With regard to advocacy of force and violence he said: "the Communist Party took the defensive, and put the first users of force upon the capitalistic government; they claimed that the capitalistic government would resist the establishment of the Soviet system, through force and violence, and that the working class would be justified in using force and violence to establish the Soviet system of society."

Hynes testified that he had been a member of the Party for eight months in 1922. He stated that the Communist method of bringing about a change in the form of government is one of force and violence; he based this statement upon: "knowledge I have gained as a member in 1922 and from what further knowledge I have gained from reading various official publications, published and circulated by the Communist Party and from observation and actual contact with the activities of the Communist Party . . ." [5] On cross-examination Hynes admitted that he never attempted a philosophic analysis of the literature he read, but only read it to secure evidence, reading and underscoring those portions which, in his opinion,

---

[5] For a discussion of the adequacy of somewhat similar testimony by Hynes see *Ex parte Fierstein,* 41 F. 2d 53.

"had to do with force or violence or overthrowing of this system of government other than by lawful means provided in the Constitution." He testified that he never saw any behavior on petitioner's part that brought him into conflict with any law.

The testimony of the two professors discussed Marxian theory as evidenced by the writings of Marx, Engels and Lenin, and concluded that it did not advocate the use of force and violence as a method of attaining its objective.

In its written opinion the district court held that petitioner's certificate of naturalization was illegally procured because the organizations to which petitioner belonged were opposed to the principles of the Constitution and advised, taught and advocated the overthrow of the Government by force and violence, and therefore petitioner, "by reason of his membership in such organizations and participation in their activities, was not 'attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same.'" 33 F. Supp. 510, 513.

The district court also made purported findings of facts to the effect that petitioner was not attached to the principles of the Constitution and well disposed to the good order and happiness of the same, and was a disbeliever in organized government, that he fraudulently concealed his membership in the League and the Party from the naturalization court, and that his oath of allegiance was false. The conclusion of law was that the certificate was illegally and fraudulently procured. The pertinent findings of fact on these points, set forth in the margin,[6] are but the most

---

[6] IV. "The Court finds that it is true that said decree and certificate of naturalization were illegally procured and obtained in this: That respondent [petitioner] was not, at the time of his naturalization by said Court, and during the period of five years immediately preceding

general conclusions of ultimate fact. It is impossible to tell from them upon what underlying facts the court relied, and whether proper statutory standards were observed. If it were not rendered unnecessary by the broad view we take of this case, we would be inclined to reverse

the filing of his petition for naturalization had not behaved as, a person attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same.

"The Court finds that it is not true that at the time of the filing of his petition for naturalization respondent was not a disbeliever in or opposed to organized government or a member of or affiliated with any organization or body of persons teaching disbelief in or opposed to organized government.

"The Court finds that in truth and in fact during all of said times respondent had not behaved as a man attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same, but was a member of and affiliated with and believed in and supported the principles of certain organizations known as the Workers Party of America, the Workers (Communist) Party of America, the Communist Party of the United States of America, the Young Workers League of America, the Young Workers (Communist) League of America and the Young Communist League of America, which organizations were, and each of them was, at all times herein mentioned, a section of the Third International, the principles of all of which said organizations were opposed to the principles of the Constitution of the United States, and advised, advocated, and taught the overthrow of the Government, Constitution and laws of the United States by force and violence and taught disbelief in and opposition to organized government.

V. "The Court further finds that during all of said times the respondent has been and now is a member of said organizations and has continued to believe in, advocate and support the said principles of said organizations."

VI. (The substance of this finding is that petitioner fraudulently concealed his Communist affiliation from the naturalization court. It is not set forth because it is not an issue here. See Note 7, *infra*.)

VII. "The court further finds that it is true that said decree and certificate of naturalization were illegally and fraudulently procured and obtained in this: That before respondent [petitioner] was admitted to citizenship as aforesaid, he declared on oath in open court

and remand to the district court for the purpose of making adequate findings.

The Circuit Court of Appeals affirmed on the ground that the certificate was illegally procured, holding that the finding that petitioner's oath was false was not "clearly erroneous." 119 F. 2d 500.[7] We granted certiorari, and after having heard argument and reargument, now reverse the judgments below.

I

The Constitution authorizes Congress "to establish an uniform rule of naturalization" (Art. I, § 8, cl. 4), and we may assume that naturalization is a privilege, to be given or withheld on such conditions as Congress sees fit. Cf.

---

that he would support the Constitution of the United States, and that he absolutely and entirely renounced and abjured all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and that he would support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same, whereas in truth and in fact, at the time of making such declarations on oath in open court, respondent [petitioner] did not intend to support the Constitution of the United States, and did not intend absolutely and entirely to renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and did not intend to support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and/or to bear true faith and allegiance to the same, but respondent at said time intended to and did maintain allegiance and fidelity to the Union of Soviet Socialist Republics and to the said Third International, and intended to adhere to and support and defend and advocate the principles and teachings of said Third International, which principles and teachings were opposed to the principles of the Constitution of the United States and advised, advocated and taught the overthrow of the Government, Constitution and laws of the United States by force and violence."

[7] That court said it was unnecessary to consider the charge of fraudulent procurement by concealment of petitioner's Communist affiliation. The Government has not pressed this charge here, and we do not consider it.

*United States* v. *Macintosh,* 283 U. S. 605, 615, and the dissenting opinion of Chief Justice Hughes, *ibid.* at p. 627. See also *Tutun* v. *United States,* 270 U. S. 568, 578; *Turner* v. *Williams,* 194 U. S. 279. But because of our firmly rooted tradition of freedom of belief, we certainly will not presume in construing the naturalization and denaturalization acts that Congress meant to circumscribe liberty of political thought by general phrases in those statutes. As Chief Justice Hughes said in dissent in the *Macintosh* case, such general phrases "should be construed, not in opposition to, but in accord with, the theory and practice of our Government in relation to freedom of conscience." 283 U. S. at 635. See also Holmes, J., dissenting in *United States* v. *Schwimmer,* 279 U. S. 644, 653–55.

When petitioner was naturalized in 1927, the applicable statutes did not proscribe communist beliefs or affiliation as such.[8] They did forbid the naturalization of disbelievers in organized government or members of organizations teaching such disbelief. Polygamists and advocates of political assassination were also barred.[9] Applicants for citizenship were required to take an oath to support the Constitution, to bear true faith and allegiance to the same and the laws of the United States, and to renounce all allegiance to any foreign prince, potentate, state or sovereignty.[10] And, it was to "be made to appear to the

---

[8] The Nationality Act of 1940, while enlarging the category of beliefs disqualifying persons *thereafter* applying for citizenship, does not in terms make communist beliefs or affiliation grounds for refusal of naturalization. § 305, 54 Stat. 1137, 1141; 8 U. S. C. § 705.

Bills to write a definition of "communist" into the Immigration and Deportation Act of 1918 as amended (40 Stat. 1012, 41 Stat. 1008) and to provide for the deportation of "communists" failed to pass Congress in 1932 and again in 1935. See H. R. 12044, H. Rep. No. 1353, S. Rep. No. 808, 75 Cong. Rec. 12097–108, 72d Cong., 1st Sess. See also H. R. 7120, H. Rep. No. 1023, pts. 1 and 2, 74th Cong., 1st Sess.

[9] § 7 of Act of June 29, 1906, 8 U. S. C. § 364.

[10] § 4 of Act of June 29, 1906, 8 U. S. C. § 381.

satisfaction of the court" of naturalization that immediately preceding the application, the applicant "has resided continuously within the United States five years at least, . . . and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." [11] Whether petitioner satisfied this last requirement is the crucial issue in this case.

To apply the statutory requirement of attachment correctly to the proof adduced, it is necessary to ascertain its meaning. On its face the statutory criterion is not attachment to the Constitution, but *behavior* for a period of five years as a man attached to its principles and well disposed to the good order and happiness of the United States. Since the normal connotation of behavior is conduct, there is something to be said for the proposition that the 1906 Act created a purely objective qualification, limiting inquiry to an applicant's previous conduct. [12] If this

---

[11] § 4 of Act of June 29, 1906, 8 U. S. C. § 382.

[12] The legislative history of the phrase gives some support to this view. The behavior requirement first appeared in the Naturalization Act of 1795, 1 Stat. 414, which was designed to tighten the Act of 1790, 1 Stat. 103. The discursive debates on the 1795 Act cast little light upon the meaning of "behaved," but indicate that the purpose of the requirement was to provide a probationary period during which aliens could learn of our Constitutional plan. Some members were disturbed by the political ferment of the age and spoke accordingly, while others regarded the United States as an asylum for the oppressed and mistrusted efforts to probe minds for beliefs. It is perhaps significant that the oath, which was adopted over the protest of Madison, the sponsor of the bill, did not require the applicant to swear that he was attached to the Constitution, but only that he would support it. See 4 Annals of Congress, pp. 1004–09, 1021–23, 1026–27, 1030–58, 1062, 1064–66. See also Franklin, Legislative History of Naturalization in the United States (1906), Chapter IV.

The behavior requirement was reënacted in 1802 (2 Stat. 153) at the recommendation of Jefferson for the repeal of the stringent Act

objective standard is the requirement, petitioner satisfied the statute. His conduct has been law abiding in all respects. According to the record he has never been arrested, or connected with any disorder, and not a single written or spoken statement of his, during the relevant period from 1922 to 1927 or thereafter, advocating violent overthrow of the Government, or indeed even a statement, apart from his testimony in this proceeding, that he desired any change in the Constitution has been produced. The sole possible criticism is petitioner's membership and activity in the League and the Party, but those memberships *qua* memberships were immaterial under the 1906 Act.

---

of 1798, 1 Stat. 566. See Franklin, *op. cit.*, Chapter VI. It continued unchanged until the Act of 1906 which for the first time imported the test of present belief into the naturalization laws when it provided in § 7 that disbelievers in organized government and polygamists could not become citizens. The continuation of the behavior test for attachment is some indication that a less searching examination was intended in this field—that conduct and not belief (other than anarchist or polygamist) was the criterion. The Nationality Act of 1940 changed the behavior requirement to a provision that no person could be naturalized unless he "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States," 54 Stat. 1142, 8 U. S. C. § 707. The Report of the President's Committee to Revise the Nationality Laws (1939) indicates this change in language was not regarded as a change in substance. p. 23. The Congressional committee reports are silent on the question. The sponsors of the Act in the House, however, declared generally an intent to tighten and restrict the naturalization laws. See 86 Cong. Rec. 11939, 11942, 11947, 11949. The chairman of the sub-committee who had charge of the bill stated that "substantive changes are necessary in connection with certain rights, with a view to preventing persons who have no real attachment to the United States from enjoying the high privilege of American nationality." 86 Cong. Rec. 11948. This remark suggests that the change from "behaved as a man attached" to "has been and still is a person attached" was a change in meaning.

In *United States* v. *Schwimmer*, 279 U. S. 644, and *United States* v. *Macintosh*, 283 U. S. 605, however, it was held that the statute created a test of belief—that an applicant under the 1906 Act must not only behave as a man attached to the principles of the Constitution, but must be so attached in fact at the time of naturalization. We do not stop to reëxamine this construction for even if it is accepted the result is not changed. As mentioned before, we agree with the statement of Chief Justice Hughes in dissent in *Macintosh's* case that the behavior requirement is "a general phrase which should be construed, not in opposition to, but in accord with, the theory and practice of our Government in relation to freedom of conscience." 283 U. S. at 635. See also the dissenting opinion of Justice Holmes in the *Schwimmer* case, *supra*, 653–55. As pointed out before, this is a denaturalization proceeding, and it is a judgment, not merely a claim or a grant, which is being attacked. Assuming as we have that the United States is entitled to attack a finding of attachment upon a charge of illegality, it must sustain the heavy burden which then rests upon it to prove lack of attachment by "clear, unequivocal, and convincing" evidence which does not leave the issue in doubt. When the attachment requirement is construed as indicated above, we do not think the Government has carried its burden of proof.

The claim that petitioner was not in fact attached to the Constitution and well disposed to the good order and happiness of the United States at the time of his naturalization and for the previous five year period is twofold: *First,* that he believed in such sweeping changes in the Constitution that he simply could not be attached to it; *Second,* that he believed in and advocated the overthrow by force and violence of the Government, Constitution and laws of the United States.

In support of its position that petitioner was not in fact attached to the principles of the Constitution because of

his membership in the League and the Party, the Government has directed our attention first to petitioner's testimony that he subscribed to the principles of those organizations, and then to certain alleged Party principles and statements by Party Leaders which are said to be fundamentally at variance with the principles of the Constitution. At this point it is appropriate to mention what will be more fully developed later—that under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles. Said to be among those Communist principles in 1927 are: the abolition of private property without compensation; the erection of a new proletarian state upon the ruins of the old bourgeois state; the creation of a dictatorship of the proletariat; denial of political rights to others than members of the Party or of the proletariat; and the creation of a world union of soviet republics. Statements that American democracy "is a fraud"[13] and that the purposes of the Party are "utterly antagonistic to the purposes for which the American democracy, so called, was formed,"[14] are stressed.

Those principles and views are not generally accepted—in fact they are distasteful to most of us—and they call for considerable change in our present form of government and society. But we do not think the Government has carried its burden of proving by evidence which does not leave the issue in doubt that petitioner was not in fact attached to the principles of the Constitution and well disposed to the good order and happiness of the United States when he was naturalized in 1927.

---

[13] Program and Constitution of the Workers Party (1921–24).

[14] Acceptance speech of William Z. Foster, the Party's nominee for the Presidency in 1928.

The constitutional fathers, fresh from a revolution, did not forge a political strait-jacket for the generations to come.[15] Instead they wrote Article V and the First Amendment, guaranteeing freedom of thought, soon followed. Article V contains procedural provisions for constitutional change by amendment without any present limitation whatsoever except that no State may be deprived of equal representation in the Senate without its consent. Cf. *National Prohibition Cases*, 253 U. S. 350. This provision and the many important and far-reaching changes made in the Constitution since 1787 refute the idea that attachment to any particular provision or provisions is essential, or that one who advocates radical changes is necessarily not attached to the Constitution.

---

[15] Writing in 1816 Jefferson said: "Some men look at constitutions with sanctimonious reverence, and deem them like the ark of the covenant, too sacred to be touched. They ascribe to the men of the preceding age a wisdom more than human, and suppose what they did to be beyond amendment. I knew that age well; I belonged to it, and labored with it. It deserved well of its country. It was very like the present, but without the experience of the present; and forty years of experience in government is worth a century of bookreading; and this they would say themselves, were they to rise from the dead. I am certainly not an advocate for frequent and untried changes in laws and constitutions. I think moderate imperfections had better be borne with; because, when once known, we accommodate ourselves to them, and find practical means of correcting their ill effects. But I know also, that laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths disclosed, and manners and opinions change with the change of circumstances, institutions must advance also, and keep pace with the times. We might as well require a man to wear still the coat which fitted him when a boy, as civilized society to remain ever under the regimen of their barbarous ancestors." Ford, Jefferson's Writings, vol. X, p. 42.

Compare his First Inaugural Address: "And let us reflect that, having banished from our land that religious intolerance under which mankind so long bled and suffered, we have yet gained little if we

*United States* v. *Rovin,* 12 F. 2d 942, 944-45.[16]   As Justice
Holmes said, "Surely it cannot show lack of attachment
to the principles of the Constitution that . . . [one]
thinks it can be improved." *United States* v. *Schwimmer,*
*supra* (dissent).   Criticism of, and the sincerity of de-
sires to improve, the Constitution should not be judged by
conformity to prevailing thought because, "if there is any
principle of the Constitution that more imperatively calls
for attachment than any other it is the principle of free
thought—not free thought for those who agree with us,
but freedom for the thought that we hate." *Id.*   See also

---

countenance a political intolerance as despotic, as wicked, and capable
of as bitter and bloody persecutions.   During the throes and convul-
sions of the ancient world, during the agonizing spasms of infuriated
man, seeking through blood and slaughter his long-lost liberty, it was
not wonderful that the agitation of the billows should reach even this
distant and peaceful shore; that this should be more felt and feared
by some and less by others, and should divide opinions as to measures
of safety.   But every difference of opinion is not a difference of
principle.   We have called by different names brethren of the same
principle.   We are all Republicans, we are all Federalists.   *If there
be any among us who would wish to dissolve this Union or to change
its republican form, let them stand undisturbed as monuments of the
safety with which error of opinion may be tolerated where reason is
left free to combat it.*   I know, indeed, that some honest men fear
that a republican government cannot be strong, that this Govern-
ment is not strong enough; but would the honest patriot, in the full
tide of successful experiment, abandon a government which has so far
kept us free and firm on the theoretic and visionary fear that this
Government, the world's best hope, may by possibility want energy
to preserve itself?   I trust not."   Richardson, Messages and Papers
of the Presidents, vol. I, p. 310 (emphasis added).

[16] See also 18 Cornell Law Quarterly 251; Freund, United States *v.*
Macintosh, A Symposium, 26 Illinois Law Review 375, 385; 46 Har-
vard Law Review 325.

As a matter of fact one very material change in the Constitution
as it stood in 1927 when petitioner was naturalized has since been
effected by the repeal of the Eighteenth Amendment.

Chief Justice Hughes dissenting in *United States* v. *Macintosh, supra,* p. 635. Whatever attitude we may individually hold toward persons and organizations that believe in or advocate extensive changes in our existing order, it should be our desire and concern at all times to uphold the right of free discussion and free thinking to which we as a people claim primary attachment. To neglect this duty in a proceeding in which we are called upon to judge whether a particular individual has failed to manifest attachment to the Constitution would be ironical indeed.

Our concern is with what Congress meant to be the extent of the area of allowable thought under the statute. By the very generality of the terms employed it is evident that Congress intended an elastic test, one which should not be circumscribed by attempts at precise definition. In view of our tradition of freedom of thought, it is not to be presumed that Congress in the Act of 1906, or its predecessors of 1795 and 1802,[17] intended to offer naturalization only to those whose political views coincide with those considered best by the founders in 1787 or by the majority in this country today. Especially is this so since the language used, posing the general test of "attachment" is not necessarily susceptible of so repressive a construction.[18] The Government agrees that an alien "may think that the laws and the Constitution should be amended in some or many respects" and still be attached to the principles of the Constitution within the meaning of the statute.

---

[17] See Note 12, *ante.*

[18] In 1938 Congress failed to pass a bill denying naturalization to any person "who believes in any form of government for the United States contrary to that now existing in the United States, or who is a member of or affiliated with any organization which advocates any form of government for the United States contrary to that now existing in the United States." H. R. 9690, 75th Cong., 3d Sess.

Without discussing the nature and extent of those permissible changes, the Government insists that an alien must believe in and sincerely adhere to the "general political philosophy" of the Constitution.[19] Petitioner is said to be opposed to that "political philosophy," the minimum requirements of which are set forth in the margin.[20] It was argued at the bar that since Article V contains no limitations, a person can be attached to the Constitution no matter how extensive the changes are that he desires, so long as he seeks to achieve his ends within the framework of Article V. But we need not consider the validity of this extreme position for if the Government's construction is accepted, it has not carried its burden of proof even under its own test.

The district court did not state in its findings what principles held by petitioner or by the Communist Party were opposed to the Constitution and indicated lack of attachment. See Note 6, *ante.* In its opinion that court merely relied upon *In re Saralieff,* 59 F. 2d 436, and *United States* v. *Tapolcsanyi,* 40 F. 2d 255, without fresh examination of the question in the light of the present record.

---

[19] Brief, pp. 103–04. Supporting this view are *In re Saralieff,* 59 F. 2d 436; *In re Van Laeken,* 22 F. Supp. 145; *In re Shanin,* 278 F. 739. See also *United States* v. *Tapolcsanyi,* 40 F. 2d 255; *Ex parte Sauer,* 81 F. 355; *United States* v. *Olsson,* 196 F. 562, reversed on stipulation, 201 F. 1022.

[20] "The test is . . . whether he substitutes revolution for evolution, destruction for construction, whether he believes in an ordered society, a government of laws, under which the powers of government are granted by the people but under a grant which itself preserves to the individual and to minorities certain rights or freedoms which even the majority may not take away; whether, in sum, the events which began at least no further back than the Declaration of Independence, followed by the Revolutionary War and the adoption of the Constitution, establish principles with respect to government, the individual, the minority and the majority, by which ordered liberty is replaced by disorganized liberty." Brief, p. 105.

33 F. Supp. 510.   The Circuit Court of Appeals deduced as Party principles roughly the same ones which the Government here presses and stated "these views are not those of our Constitution."   119 F. 2d at 503–04.

With regard to the Constitutional changes he desired petitioner testified that he believed in the nationalization of the means of production and exchange with compensation, and the preservation and utilization of our "democratic structure . . . as far as possible for the advantage of the working classes."   He stated that the "dictatorship of the proletariat" to him meant "not a government, but a state of things" in which "the majority of the people shall really direct their own destinies and use the instrument of the state for these truly democratic ends."   None of this is necessarily incompatible with the "general political philosophy" of the Constitution as outlined above by the Government.   It is true that the Fifth Amendment protects private property, even against taking for public use without compensation.   But throughout our history many sincere people whose attachment to the general constitutional scheme cannot be doubted have, for various and even divergent reasons, urged differing degrees of governmental ownership and control of natural resources, basic means of production, and banks and the media of exchange, either with or without compensation.   And something once regarded as a species of private property was abolished without compensating the owners when the institution of slavery was forbidden.[21]   Can it be said that the author of the Emancipation Proclamation and the supporters of the Thirteenth Amendment were not attached to the Constitution?   We conclude that lack of attachment to the Constitution is not shown on the basis of

---

[21] See generally Thorpe, Constitutional History of the United States (1901), vol. III, book V.

Compare the effect of the Eighteenth Amendment.

the changes which petitioner testified he desired in the Constitution.

Turning now to a *seriatim* consideration of what the Government asserts are principles of the Communist Party, which petitioner believed and which are opposed to our Constitution, our conclusion remains the same— the Government has not proved by "clear, unequivocal and convincing" evidence that the naturalization court could not have been satisfied that petitioner was attached to the principles of the Constitution when he was naturalized.

We have already disposed of the principle of nationalization of the agents of production and exchange with or without compensation. The erection of a new proletariat state upon the ruins of the old bourgeois state, and the creation of a dictatorship of the proletariat may be considered together. The concept of the dictatorship of the proletariat is one loosely used, upon which more words than light have been shed. Much argument has been directed as to how it is to be achieved, but we have been offered no precise definition here. In the general sense the term may be taken to describe a state in which the workers or the masses, rather than the bourgeoisie or capitalists are the dominant class. Theoretically it is control by a class, not a dictatorship in the sense of absolute and total rule by one individual. So far as the record before us indicates, the concept is a fluid one, capable of adjustment to different conditions in different countries. There are only meager indications of the form the "dictatorship" would take in this country. It does not appear that it would necessarily mean the end of representative government or the federal system. The Program and Constitution of the Workers Party (1921–24) criticized the constitutional system of checks and balances, the Senate's power to pass on legislation, and the involved procedure

for amending the Constitution, characterizing them as devices designed to frustrate the will of the majority.[22] The 1928 platform of the Communist Party of the United States, adopted after petitioner's naturalization and hence not strictly relevant, advocated the abolition of the Senate, of the Supreme Court, and of the veto power of the President, and replacement of congressional districts with "councils of workers" in which legislative and executive power would be united. These would indeed be significant changes in our present governmental structure—changes which it is safe to say are not desired by the majority of the people in this country—but whatever our personal views, as judges we cannot say that a person who advocates their adoption through peaceful and constitutional means is not in fact attached to the Constitution—those institutions are not enumerated as necessary in the Government's test of "general political philosophy," and it is conceivable that "ordered liberty" could be maintained without them. The Senate has not gone free of criticism and one object of the Seventeenth Amendment was to make it more responsive to the public will.[23] The unicameral legislature is not unknown in the country.[24] It is true that this Court has played a large part in the unfolding of the constitutional plan (sometimes too much so in the opinion of some observers), but we would be arrogant indeed if we presumed that a government of laws, with protection for minority groups, would be impossible without it. Like other agencies of government, this Court at various times in its existence has not escaped

---

[22] Petitioner testified that this was never adopted, but was merely a draft for study.

[23] See Haynes, The Senate of the United States (1938), pp. 11, 96–98. 106–115, 1068–74.

[24] Compare Nebraska's experiment with such a body. Nebraska Constitution, Article III, § 1. See 13 Nebraska Law Bulletin 341.

the shafts of critics whose sincerity and attachment to the Constitution is beyond question—critics who have accused it of assuming functions of judicial review not intended to be conferred upon it, or of abusing those functions to thwart the popular will, and who have advocated various remedies taking a wide range.[24a]   And it is hardly conceivable that the consequence of freeing the legislative branch from the restraint of the executive veto would be the end of constitutional government.[24b]   By this discussion we certainly do not mean to indicate that we would favor such changes.   Our preference and aversions have no bearing here.   Our concern is with the extent of the allowable area of thought under the statute.   We decide only that it is possible to advocate such changes and still be attached to the Constitution within the meaning of the Government's minimum test.

If any provisions of the Constitution can be singled out as requiring unqualified attachment, they are the guaranties of the Bill of Rights and especially that of freedom of thought contained in the First Amendment. Cf. Justice Holmes' dissent in *United States* v. *Schwimmer, supra.* We do not reach, however, the question whether petitioner was attached to the principles of the Constitution if he believed in denying political and civil rights to persons not members of the Party or of the so-called proletariat, for on the basis of the record before us it has not been clearly shown that such denial was a principle of the organizations to which petitioner belonged.

---

[24a] E. g., the recall of judicial decisions.   See Theodore Roosevelt, A Charter of Democracy, S. Doc. No. 348, 62d Cong., 2d Sess.   For proposed constitutional amendments relating to the judiciary and this Court see H. Doc. No. 353, pt. 2, 54th Cong., 2d Sess., pp. 144–64; S. Doc. No. 93, 69th Cong., 1st Sess., pp. 83, 86, 93, 101, 111, 123, 133.

[24b] For an account of the attacks on the veto power see H. Doc. No. 353, pt. 2, 54th Cong., 2d Sess., pp. 129–34.

Since it is doubtful that this was a principle of those organizations, it is certainly much more speculative whether this was part of petitioner's philosophy. Some of the documents in the record indicate that "class enemies" of the proletariat should be deprived of their political rights.[25] Lenin, however, wrote that this was not necessary to realize the dictatorship of the proletariat.[26] The Party's 1928 platform demanded the unrestricted right to organize, to strike and to picket and the unrestricted right of free speech, free press and free assemblage for the working class. The 1928 Program of the Communist International states that the proletarian State will grant religious freedom, while at the same time it will carry on anti-religious propaganda.

We should not hold that petitioner is not attached to the Constitution by reason of his possible belief in the creation of some form of world union of soviet republics unless we are willing so to hold with regard to those who believe in Pan-Americanism, the League of Nations, Union Now, or some other form of international collaboration

---

[25] ABC of Communism; Lenin, State and Revolution; Statutes, Theses and Conditions of Admission to the Communist International; Stalin, Theory and Practice of Leninism; 1928 Program of the Communist International.

[26] "It should be observed that the question of depriving the exploiters of the franchise is purely a Russian question, and not a question of the dictatorship of the proletariat in general. . . . It would be a mistake, however, to guarantee in advance that the impending proletarian revolutions in Europe will all, or for the most part, be necessarily accompanied by the restriction of the franchise for the bourgeoisie. Perhaps they will. After our experience of the war and of the Russian revolution we can say that it will probably be so; but it is not absolutely necessary for the purpose of realizing the dictatorship, it is not an essential symptom of the logical concept 'dictatorship,' it does not enter as an essential condition in the historical and class concept 'dictatorship.'" Selected Works, vol. VII, pp. 142–3. (Placed in evidence by petitioner.)

or collective security which may grow out of the present holocaust. A distinction here would be an invidious one based on the fact that we might agree with or tolerate the latter but dislike or disagree with the former.

If room is allowed, as we think Congress intended, for the free play of ideas, none of the foregoing principles, which might be held to stand forth with sufficient clarity to be imputed to petitioner on the basis of his membership and activity in the League and the Party and his testimony that he subscribed to the principles of those organizations, is enough, whatever our opinion as to their merits, to prove that he was necessarily not attached to the Constitution when he was naturalized. The cumulative effect is no greater.

Apart from the question whether the alleged principles of the Party which petitioner assertedly believed were so fundamentally opposed to the Constitution that he was not attached to its principles in 1927, the Government contends that petitioner was not attached because he believed in the use of force and violence instead of peaceful democratic methods to achieve his desires. In support of this phase of its argument the Government asserts that the organizations with which petitioner was actively affiliated advised, advocated and taught the overthrow of the Government, Constitution and laws of the United States by force and violence, and that petitioner therefore believed in that method of governmental change.

Apart from his membership in the League and the Party, the record is barren of any conduct or statement on petitioner's part which indicates in the slightest that he believed in and advocated the employment of force and violence, instead of peaceful persuasion, as a means of attaining political ends. To find that he so believed and advocated it is necessary, therefore, to find that such was a principle of the organizations to which he belonged and then impute that principle to him on the basis of his

activity in those organizations and his statement that he subscribed to their principles. The Government frankly concedes that "it is normally true . . . that it is unsound to impute to an organization the views expressed in the writings of all its members, or to impute such writings to each member . . ."[27] But the Government contends, however, that it is proper to impute to petitioner certain excerpts from the documents in evidence upon which it particularly relies to show that advocacy of force and violence was a principle of the Communist Party of the United States in 1927, because those documents were official publications carefully supervised by the Party, because of the Party's notorious discipline over its members, and because petitioner was not a mere "rank and file or accidental member of the Party," but "an intelligent and educated individual" who "became a leader of these organizations as an intellectual revolutionary."[28] Since the immediate problem is the determination with certainty of petitioner's beliefs from 1922 to 1927, events and writings since that time have little relevance, and both parties have attempted to confine themselves within the limits of that critical period.

For some time the question whether advocacy of governmental overthrow by force and violence is a principle of the Communist Party of the United States has perplexed courts, administrators, legislators, and students. On varying records in deportation proceedings some courts have held that administrative findings that the Party did so advocate were not so wanting in evidential support as to amount to a denial of due process,[29] others have held

---

[27] Brief, pp. 23–24.

[28] Brief, pp. 25–26.

[29] *In re Saderquist*, 11 F. Supp. 525; *Skeffington* v. *Katzeff*, 277 F. 129; *United States* v. *Curran*, 11 F. 2d 683; *Kenmotsu* v. *Nagle*, 44 F. 2d 953; *Sormunen* v. *Nagle*, 59 F. 2d 398; *Branch* v. *Cahill*, 88 F. 2d 545; *Ex parte Vilarino*, 50 F. 2d 582; *Kjar* v. *Doak*, 61 F. 2d 566;

to the contrary on different records,[30] and some seem to have taken the position that they will judicially notice that force and violence is a Party principle.[31] This Court has never passed upon the question whether the Party does so advocate, and it is unnecessary for us to do so now.

With commendable candor the Government admits the presence of sharply conflicting views on the issue of force and violence as a Party principle,[32] and it also concedes that "some communist literature in respect of force and violence is susceptible of an interpretation more rhetorical than literal."[33] It insists, however, that excerpts from the documents on which it particularly relies, are enough to show that the trial court's finding that the Communist Party advocated violent overthrow of the Government was not "clearly erroneous," and hence can not be set aside.[34] As previously pointed out, the trial court's findings do not indicate the bases for its conclusions, but the documents published prior to 1927 stressed by the Government, with the pertinent excerpts noted in the margin,

---

*Berkman* v. *Tillinghast,* 58 F. 2d 621; *United States* v. *Smith,* 2 F. 2d 90; *United States* v. *Wallis,* 268 F. 413.

[30] *Strecker* v. *Kessler,* 95 F. 2d 976, 96 F. 2d 1020, affirmed on other grounds, 307 U. S. 22; *Ex parte Fierstein,* 41 F. 2d 53; *Colyer* v. *Skeffington,* 265 F. 17, reversed *sub nom. Skeffington* v. *Katzeff,* 277 F. 129.

[31] *United States ex rel. Yokinen* v. *Commissioner,* 57 F. 2d 707; *United States* v. *Perkins,* 79 F. 2d 533; *United States ex rel. Fernandas* v. *Commissioner,* 65 F. 2d 593; *Ungar* v. *Seaman,* 4 F. 2d 80; *Ex parte Jurgans,* 17 F. 2d 507; *United States ex rel. Fortmueller* v. *Commissioner,* 14 F. Supp. 484; *Murdoch* v. *Clark,* 53 F. 2d 155; *Wolck* v. *Weedin,* 58 F. 2d 928.

[32] Brief, p. 60.

[33] Brief, p. 77. See also *Colyer* v. *Skeffington,* 265 F. 17, 59, reversed *sub nom. Skeffington* v. *Katzeff,* 277 F. 129. And see Evatt, J., in *King* v. *Hush* (*Ex parte Devanny*), 48 C. L. R. 487, 516–18.

[34] Rule 52 (a) of the Rules of Civil Procedure, 28 U. S. C. A., following § 723 (c).

are: The Communist Manifesto of Marx and Engels;[35] The State and Revolution by Lenin;[36] The Statutes,

[35] The Manifesto was proclaimed in 1848. The edition in evidence was published by the International Publishers in 1932. Petitioner testified that he believed it to be an authorized publication, that he was familiar with the work, that it was used in classes, and that he thought its principles were correct "particularly as they applied to the period in which they were written and the country about which they were written."

The excerpts stressed are: "The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions."

．　　　　．　　　　．　　　　．　　　　．

"Though not in substance, yet in form, the struggle of the proletariat with the bourgeoisie is at first a national struggle. The proletariat of each country must, of course, first of all settle matters with its own bourgeoisie.

"In depicting the most general phases of the development of the proletariat, we traced the more or less veiled civil war, raging within existing society, up to the point where that war breaks out into open revolution, and where the violent overthrow of the bourgeoisie lays the foundation for the sway of the proletariat."

[36] This work was written in 1917 between the February and October Revolutions in Russia. The copy in evidence was published in 1924 by the Daily Worker Publishing Company. Petitioner testified that it was circulated by the Party and that it was probably used in the classes of which he was "educational director."

The excerpts are:

"Fifth, in the same work of Engels, . . . there is also a disquisition on the nature of a violent revolution; and the historical appreciation of its role becomes, with Engels, a veritable panegyric of a revolution by force. This, of course, no one remembers. To talk or even to think of the importance of this idea, is not considered respectable by our modern Socialist parties, and in the daily propaganda and agitation among the masses it plays no part whatever. Yet it is indissolubly bound up with the 'withering away' of the state in one harmonious whole. Here is Engels' argument:

" 'That force also plays another part in history (other than that of a perpetuation of evil), namely a *revolutionary* part; that as Marx

Theses and Conditions of Admission to the Communist International;[37] and The Theory and Practice of Lenin-

says, it is the midwife of every old society when it is pregnant with a new one; that force is the instrument and the means by which social movements hack their way through and break up the dead and fossilized political forms—of all this not a word by Herr Duehring. . Duly, with sighs and groans, does he admit the possibility that for the overthrow of the system of exploitation force may, perhaps, be necessary, but most unfortunate if you please, because all use of force, forsooth, demoralizes its user! And this is said in face of the great moral and intellectual advance which has been the result of every victorious revolution! . . . And this turbid, flabby, impotent, parson's mode of thinking dares offer itself for acceptance to the most revolutionary party history has ever known.' "

"The necessity of systematically. fostering among the masses this and only this point of view about violent revolution lies at the root of the whole of Marx's and Engels' teaching, and it is just the neglect of such propaganda and agitation both by the present predominant Social-Chauvinists and the Kautskian schools that brings their betrayal of it into prominent relief."

(Quoting Engels) " 'Revolution is an act in which part of the population forces its will on the other parts by means of rifles, bayonets, cannon, i. e., by most authoritative means. And the conquering party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries.' "

[37] Petitioner contends that this document was never introduced in evidence, and the record shows only that it was marked for identification. The view we take of the case makes it immaterial whether this document is in evidence or not. The copy furnished us was printed in 1923 under the auspices of the Workers Party. Hynes testified that it was an official publication, but not widely circulated. Petitioner had no recollection of the particular pamphlet and testified that the American party was not bound by it.

The excerpts are:

"That which before the victory of the proletariat seems but a theoretical difference of opinion on the question of 'democracy,' be-

ism, written by Stalin.[38]   The Government also sets forth
excerpts from other documents which are entitled to little

comes inevitably on the morrow of the victory, a question which can
only be decided by force of arms."

.             .             .             .             .

"The working class cannot achieve the victory over the bourgeoisie
by means of the general strike alone, and by the policy of folded arms
The proletariat must resort to an armed uprising."

.             .             .             .             .

"The elementary means of the struggle of the proletariat against
the rule of the bourgeoisie is, first of all, the method of mass demon-
strations.   Such mass demonstrations are prepared and carried out
by the organized masses of the proletariat, under the direction of a
united, disciplined, centralized Communist Party.   *Civil war is war.*
In this war the proletariat must have its efficient political officers, its
good political general staff, to conduct operations during all the stages
of that fight.

"The mass struggle means a whole system of developing demon-
strations growing ever more acute in form, and logically leading to an
uprising against the capitalist order of the government.   In this war-
fare of the masses developing into a civil war, the guiding party of the
proletariat must, as a general rule, secure every and all lawful posi-
tions, making them its auxiliaries in the revolutionary work, and sub-
ordinating such positions to the plans of the general campaign, that
of the mass struggle."

[38] The copy in evidence was printed by the Daily Worker Publish-
ing Company either in 1924 or 1925.   Petitioner was familiar with
the work, but not the particular edition, and testified that it was
probably circulated by the Party.   He had read it, but probably
after his naturalization.   Hynes and Humphreys testified that it was
used in communist classes.

The excerpts are:

"Marx's limitation with regard to the 'continent' has furnished the
opportunists and mensheviks of every country with a pretext for
asserting that Marx admitted the possibility of a peaceful transforma-
tion of bourgeois democracy into proletarian democracy, at least [in]
some countries (England and America).   Marx did in fact recognize
the possibility of this in the England and America of 1860, where

weight because they were published after the critical period.[39]

monopolist capitalism and Imperialism did not exist and where militarism and bureaucracy were as yet little developed. But now the situation in these countries is radically different; Imperialism has reached its apogee there, and there militarism and bureaucracy are sovereign. In consequence, Marx's restriction no longer applies."

"With the Reformist, reform is everything, whilst in revolutionary work it only appears as a form. This is why with the reformist tactic under a bourgeois government, all reform tends inevitably to consolidate the powers that be, and to weaken the revolution.

"With the revolutionary, on the contrary, the main thing is the revolutionary work and not the reform. For him, reform is only an accessory of revolution."

[39](a) Program of the Communist International, adopted in 1928 and published by the Workers Library Publishers, Inc., in 1929:

"Hence, revolution is not only necessary because there is no other way of overthrowing the *ruling* class, but also because, only in the process of revolution is the *overthrowing* class able to purge itself of the dross of the old society and become capable of creating a new society."

Petitioner "agreed with the general theoretical conclusions stated in" this Program, but he regarded "the application of that theory" as "something else."

(b) Programme of the Young Communist International, published in 1929: "An oppressed class which does not endeavor to possess and learn to handle arms would deserve to be treated as slaves. We would become bourgeois pacifists or opportunists if we forget that we are living in a class society, and that the only way out is through class struggle and the overthrow of the power of the ruling class. Our slogan must be: 'Arming of the proletariat, to conquer, expropriate and disarm the bourgeoisie.' Only after the proletariat has disarmed the bourgeoisie will it be able, without betraying its historic task, to throw all arms on the scrap heap. This the proletariat will undoubtedly do. But only then, and on no account sooner."

(c) Why Communism, written by Olgin, and published first in 1933, by the Workers Library Publishers:

"We Communists say that there is one way to abolish the capitalist State, and that is to smash it by force. To make Communism possible

The bombastic excerpts set forth in Notes 35 to 38 inclusive, upon which the Government particularly relies, lend considerable support to the charge. We do not say that a reasonable man could not possibly have found, as the district court did, that the Communist Party in 1927 actively urged the overthrow of the Government by force and violence.[40] But that is not the issue here. We are not concerned with the question whether a reasonable man might so conclude, nor with the narrow issue whether ad-

---

the workers must take hold of the State machinery of capitalism and destroy it."

Petitioner testified that he had not read this book, but that it had been widely circulated by the Party.

[40] Since the district court did not specify upon what evidence its conclusory findings rested, it is well to mention the remaining documents published before 1927 which were introduced into evidence and excerpts from which were read into the record, but upon which the Government does not specifically rely with respect to the issue of force and violence. Those documents are: Lenin, Left Wing Communism, first published in English about 1920; Bucharin and Preobraschensky, ABC of Communism, written in 1919 and published around 1921 in this country (petitioner testified that this was never an accepted work and that its authors were later expelled from the International); International of Youth, a periodical published in 1925; The 4th National Convention of the Workers Party of America, published in 1925; The Second Year of the Workers Party in America (1924); and, The Program and Constitution of the Workers Party of America, circulated around 1924. With the exception of these last two documents, the excerpts read into the record from these publications contain nothing exceptional on the issue of force and violence. The excerpts from the last two documents stress the necessity for Party participation in elections, but declare that the Party fosters no illusions that the workers can vote their way to power, the expulsion of the Socialist members of the New York Assembly (see Chafee, Free Speech in the United States (1941), pp. 269–82) being cited as an example in point. These statements are open to an interpretation of prediction, not advocacy of force and violence. Cf. Note 48, *infra*.

ministrative findings to that effect are so lacking in evidentiary support as to amount to a denial of due process. As pointed out before, this is a denaturalization proceeding in which, if the Government is entitled to attack a finding of attachment as we have assumed, the burden rests upon it to prove the alleged lack of attachment by "clear, unequivocal and convincing" evidence. That burden has not been carried. The Government has not proved that petitioner's beliefs on the subject of force and violence were such that he was not attached to the Constitution in 1927.

In the first place this phase of the Government's case is subject to the admitted infirmities of proof by imputation.[41] The difficulties of this method of proof are here increased by the fact that there is, unfortunately, no absolutely accurate test of what a political party's principles are.[42] Political writings are often over-exaggerated polemics bearing the imprint of the period and the place in which written.[43] Philosophies cannot generally be studied *in vacuo*. Meaning may be wholly distorted by lifting sentences out of context, instead of construing them as part of an organic whole. Every utterance of party leaders is not taken as party gospel. And we would deny our experience as men if we did not recognize that official party programs are unfortunately often opportunistic de-

---

[41] As Chief Justice (then Mr.) Hughes said in opposing the expulsion of the Socialist members of the New York Assembly: ". . . it is of the essence of the institutions of liberty that it be recognized that guilt is personal and cannot be attributed to the holding of opinion or to mere intent in the absence of overt acts; . . ." Memorial of the Special Committee Appointed by the Association of the Bar of the City of New York, New York Legislative Documents, vol. 5, 143d Session (1920), No. 30, p. 4.

[42] See Chafee, Free Speech in the United States (1941), pp. 219–24.

[43] See Note 33, *ante*.

vices as much honored in the breach as in the observance.[44] On the basis of the present record we cannot say that the Communist Party is so different in this respect that its principles stand forth with perfect clarity, and especially is this so with relation to the crucial issue of advocacy of force and violence, upon which the Government admits the evidence is sharply conflicting. The presence of this conflict is the second weakness in the Government's chain of proof. It is not eliminated by assiduously adding further excerpts from the documents in evidence to those culled out by the Government.

The reality of the conflict in the record before us can be pointed out quickly. Of the relevant prior to 1927 documents relied upon by the Government three are writings of outstanding Marxist philosophers, and leaders, the fourth is a world program.[45] The Manifesto of 1848 was proclaimed in an autocratic Europe engaged in suppressing the abortive liberal revolutions of that year. With this background, its tone is not surprising.[46] Its authors later stated, however, that there were certain countries, "such as the United States and England in which the workers may hope to secure their ends by peaceful means." [47] Lenin doubted this in his militant work, The State and Revolution, but this was written on the eve of the Bolshevist revolution in Russia and may be interpreted as intended in part to justify the Bolshevist

---

[44] See Bryce, the American Commonwealth (1915) vol. II, p. 334; III Encyclopedia of the Social Sciences, p. 164.

[45] See Notes 35 to 38 inclusive, *ante*.

[46] Petitioner testified that he believed its principles, particularly as they applied to the period and country in which written. See Note 35, *ante*.

[47] Marx, Amsterdam Speech of 1872; see also Engels' preface to the First English Translation of Capital (1886).

course and refute the anarchists and social democrats.[48] Stalin declared that Marx's exemption for the United States and England was no longer valid.[49] He wrote, however, that "the proposition that the prestige of the Party can be built upon violence . . . is absurd and absolutely incompatible with Leninism." [50] And Lenin wrote "In order to obtain the power of the state the class conscious workers must win the majority to their side. As long as no violence is used against the masses, there is no other road to power. We are not Blanquists, we are not in favor of the seizure of power by a minority." [51] The 1938 Constitution of the Communist Party of the United States, which petitioner claimed to be the first and only written constitution ever officially adopted by the Party and which he asserted enunciated the principles of the Party as he understood them from the beginning

---

[48] Lenin's remarks on England have been interpreted as simply predicting, not advocating, the use of violence there. See the introduction to Strachey, The Coming Struggle for Power (1935).

[49] See Note 38, *ante*.

[50] Stalin, Leninism, vol. I, pp. 282–83. Put in evidence by petitioner.

[51] Lenin, Selected Works, vol. VI. Put in evidence by petitioner. In the same work is the following:

"Marxism is an extremely profound and many sided doctrine. It is, therefore, not surprising that *scraps* of quotations from Marx—especially when the quotations are *not* to the point—can always be found among the 'arguments' of those who are breaking with Marxism. A military conspiracy is Blanquism *if* it is not organized by the party of a definite class; *if* its organizers have not reckoned with the political situation in general and the international situation in particular; *if* the party in question does not enjoy the sympathy of the majority of the people, as proved by definite facts; *if* the development of events in the revolution has not led to the virtual dissipation of the illusions of compromise entertained by the petty bourgeoisie; *if* the majority of the organs of the revolutionary struggle which are recognized to be 'authoritative' or have otherwise established themselves, such as the Soviets, have not been won over; *if* in the army (in time of war) sentiments hostile to a government which drags out an unjust war

of his membership, ostensibly eschews resort to force and violence as an element of Party tactics.[52]

A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open.

There is a material difference between agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil, and mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time—prediction that is not calculated or intended to be presently acted upon, thus

---

against the will of the people have not become fully matured; *if* the slogans of the insurrection (such as 'All power to the Soviets,' 'Land to the peasants,' 'Immediate proposal of a democratic peace to all the belligerent peoples, coupled with the immediate abrogation of all secret treaties and secret diplomacy,' etc.) have not acquired the widest renown and popularity; *if* the advanced workers are not convinced of the desperate situation of the masses and of the support of the countryside, as demonstrated by an energetic peasant movement, or by a revolt against the landlords and against the government that defends the landlords; *if* the economic situation in the country offers any real hope of a favorable solution of the crisis by peaceful and parliamentary means."

[52] Article X, § 5. Party members found to be strike-breakers, degenerates, habitual drunkards, betrayers of Party confidence, provocateurs, advocates of terrorism and violence as a method of Party procedure, or members whose actions are detrimental to the Party and the working class, shall be summarily dismissed from positions of responsibility, expelled from the Party and exposed before the general public.

leaving opportunity for general discussion and the calm processes of thought and reason. Cf. *Bridges* v. *California,* 314 U. S. 252, and Justice Brandeis' concurring opinion in *Whitney* v. *California,* 274 U. S. 357, 372–80. See also *Taylor* v. *Mississippi,* 319 U. S. 583. Because of this difference we may assume that Congress intended, by the general test of "attachment" in the 1906 Act, to deny naturalization to persons falling into the first category but not to those in the second. Such a construction of the statute is to be favored because it preserves for novitiates as well as citizens the full benefit of that freedom of thought which is a fundamental feature of our political institutions. Under the conflicting evidence in this case we cannot say that the Government has proved by such a preponderance of the evidence that the issue is not in doubt, that the attitude of the Communist Party of the United States in 1927 towards force and violence was not susceptible of classification in the second category. Petitioner testified that he subscribed to this interpretation of Party principles when he was naturalized, and nothing in his conduct is inconsistent with that testimony. We conclude that the Government has not carried its burden of proving by "clear, unequivocal, and convincing" evidence which does not leave "the issue in doubt," that petitioner obtained his citizenship illegally. In so holding we do not decide what interpretation of the Party's attitude toward force and violence is the most probable on the basis of the present record, or that petitioner's testimony is acceptable at face value. We hold only that where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a denaturalization proceeding, assuming that it can re-examine a finding of attachment upon a charge of illegal procurement, is not justified in canceling a certificate of citizenship by imputing the reprehensible interpretation to a

member of the organization in the absence of overt acts indicating that such was his interpretation. So uncertain a chain of proof does not add up to the requisite "clear, unequivocal, and convincing" evidence for setting aside a naturalization decree. Were the law otherwise, valuable rights would rest upon a slender reed, and the security of the status of our naturalized citizens might depend in considerable degree upon the political temper of majority thought and the stresses of the times. Those are consequences foreign to the best traditions of this nation and the characteristics of our institutions.

## II

This disposes of the issues framed by the Government's complaint which are here pressed. As additional reasons for its conclusion that petitioner's naturalization was fraudulently and illegally procured, the district court found, however, that petitioner was a disbeliever in, and a member of an organization teaching disbelief in, organized government,[53] and that his oath of allegiance, required by 8 U. S. C. § 381, was false. These issues are outside the scope of the complaint,[54] as is another ground urged

---

[53] In 1927 naturalization was forbidden to such persons by § 7 of the Act of 1906, 34 Stat. 598, 8 U. S. C. § 364. Compare § 305 of the Nationality Act of 1940, 54 Stat. 1141, 8 U. S. C. § 705.

[54] The complaint did incorporate by reference an affidavit of cause, required by 8 U. S. C. § 405, in which the affiant averred that petitioner's naturalization was illegally and fraudulently obtained, in that he did not behave as a man and was not a man attached to the Constitution but was a member of the Communist Party which was opposed to the Government and advocated its overthrow by force and violence, and in that: "At the time he took said oath of allegiance, he did not in fact intend to support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same."

While this affidavit is part of the complaint, we think it was not intended to be an additional charge, but was included only to show

in support of the judgment below as to which the district court made no findings.[55] Because they are outside the scope of the complaint, we do not consider them. As we said in *De Jonge* v. *Oregon*, "Conviction upon a charge not made would be sheer denial of due process." 299 U. S. 353, 362. A denaturalization suit is not a criminal proceeding. But neither is it an ordinary civil action since it involves an important adjudication of status. Consequently we think the Government should be limited, as in a criminal proceeding, to the matters charged in its complaint.

One other ground advanced in support of the judgment below was not considered by the lower courts and does not merit detailed treatment. It is that petitioner was not entitled to naturalization because he was deportable in 1927 under the Immigration Act of 1918 (40 Stat. 1012, as amended by 41 Stat. 1008; 8 U. S. C. § 137) as an alien member of an organization advocating overthrow of the Government of the United States by force and violence. This issue is answered by our prior discussion of the evidence in this record relating to force and violence. Assuming that deportability at the time of naturalization satisfies the requirement of illegality under § 15 which governs this proceeding, the same failure to establish adequately the attitude toward force and violence of the

---

compliance with the statute. The attachment averment of the affidavit is elaborated and set forth as a specific charge in the complaint. The failure to do likewise with the averment of a false oath is persuasive that the issue was not intended to be raised. When petitioner moved for a non-suit at the close of the Government's case, the United States attorney did not contend, in stating what he conceived the issues were, that the question of a false oath was an issue.

[55] This contention is that petitioner was not well disposed to the good order and happiness of the United States because he believed in and advocated general resort to illegal action, other than force and violence, as a means of achieving political ends.

organizations to which petitioner belonged forbids his denaturalization on the ground of membership.

The judgment is reversed and the cause remanded to the Circuit Court of Appeals for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring:

I join in the Court's opinion and agree that petitioner's want of attachment in 1927 to the principles of the Constitution has not been shown by "clear, unequivocal and convincing" evidence. The United States, when it seeks to deprive a person of his American citizenship, carries a heavy burden of showing that he procured it unlawfully. That burden has not been sustained on the present record, as the opinion of the Court makes plain, unless the most extreme views within petitioner's party are to be imputed or attributed to him and unless all doubts which may exist concerning his beliefs in 1927 are to be resolved against him rather than in his favor. But there is another view of the problem raised by this type of case which is so basic as to merit separate statement.

Sec. 15 of the Naturalization Act gives the United States the power and duty to institute actions to set aside and cancel certificates of citizenship on the ground of "fraud" or on the ground that they were "illegally procured." Sec. 15 "makes nothing fraudulent or unlawful that was honest and lawful when it was done. It imposes no new penalty upon the wrongdoer. But if, after fair hearing, it is judicially determined that by wrongful conduct he has obtained a title to citizenship, the act provides that he shall be deprived of a privilege that was never rightfully his." *Johannessen* v. *United States,* 225 U. S. 227, 242–243. And see *Luria* v. *United States,* 231 U. S. 9, 24. "Wrongful conduct"—like the statutory words "fraud" or "illegally procured"—are strong words. Fraud con-

notes perjury, concealment, falsification, misrepresentation or the like. But a certificate is illegally, as distinguished from fraudulently, procured when it is obtained without compliance with a "condition precedent to the authority of the Court to grant a petition for naturalization." *Maney* v. *United States*, 278 U. S. 17, 22.

Under the Act in question, as under earlier and later Acts,[1] Congress prescribed numerous conditions precedent to the issuance of a certificate. They included the requirement that the applicant not be an anarchist or polygamist (§ 7), the presentation of a certificate of arrival (*United States* v. *Ness*, 245 U. S. 319), the requirement that the final hearing be had in open court (*United States* v. *Ginsberg*, 243 U. S. 472), the residence requirement (R. S. § 2170), the general requirement that the applicant be able to speak the English language (§ 8), etc. The foregoing are illustrative of one type of condition which Congress specified. Another type is illustrated by the required finding of attachment. Sec. 4, as it then read, stated that it "shall be made to appear to the satisfaction of the court" that the applicant "has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same."[2] It is my view that Congress by that provision made the finding the condition preced-

---

[1] For the Act in its present form see 8 U. S. C. § 501 *et seq.*

[2] This provision was recast by the Act of March 2, 1929, 45 Stat. 1513–1514, 8 U. S. C. § 707 (a) (3), into substantially its present form. For the legislative history see 69 Cong. Rec. 841; S. Rep. No. 1504, 70th Cong., 2d Sess. The provision now reads: "No person, except as hereinafter provided in this chapter, shall be naturalized unless such petitioner . . . (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

ent, not the weight of the evidence underlying the finding. Such a finding can of course be set aside under § 15 on grounds of fraud. But so far as certificates "illegally procured" are concerned, this Court has heretofore permitted § 15 to be used merely to enforce the express conditions specified in the Act. It is of course true that an applicant for citizenship was required to come forward and make the showing necessary for the required findings. § 4. But under this earlier Act, it was not that showing but the finding of the court which Congress expressed in the form of a condition. If § 15 should be broadened by judicial construction to permit the findings of attachment to be set aside for reasons other than fraud, then the issue of illegality would be made to turn not on the judge being satisfied as to applicant's attachment but on the evidence underlying that finding. Such a condition should not be readily implied.

If an anarchist is naturalized, the United States may bring an action under § 15 to set aside the certificate on the grounds of illegality. Since Congress by § 7 of the Act forbids the naturalization of anarchists, the alien anarchist who obtains the certificate has procured it illegally whatever the naturalization court might find. The same would be true of communists if Congress declared they should be ineligible for citizenship. Then proof that one was not a communist and did not adhere to that party or its belief would become like the other express conditions in the Act a so-called "jurisdictional" fact "upon which the grant is predicated." *Johannessen* v. *United States, supra,* p. 240. But under this Act Congress did not treat communists like anarchists. Neither the statute nor the official forms used by applicants called for an expression by petitioner of his attitude on, or his relationship to, communism, or any other foreign political creed except anarchy and the like.

164

The findings of attachment are entrusted to the naturalization court with only the most general standard to guide it. That court has before it, however, not only the applicant but at least two witnesses. It makes its appraisal of the applicant and it weighs the evidence. Its conclusion must often rest on imponderable factors. In the present case we do not know how far the naturalization court probed into petitioner's political beliefs and affiliations. We do not know what inquiry it made. All we do know is that it was satisfied that petitioner was "attached to the principles of the Constitution of the United States." But we must assume that that finding which underlies the judgment granting citizenship (cf. *Tutun* v. *United States,* 270 U. S. 568) was supported by evidence. We must assume that the evidence embraced all relevant facts since no charge of concealment or misrepresentation is now made by respondent. And we must assume that the applicant and the judge both acted in utmost good faith.

If the applicant answers all questions required of him, if there is no concealment or misrepresentation, the findings of attachment cannot be set aside on the grounds of illegality in proceedings under § 15. It does not comport with any accepted notion of illegality to say that in spite of the utmost good faith on the part of applicant and judge and in spite of full compliance with the express statutory conditions a certificate was illegally procured because another judge would appraise the evidence differently. That would mean that the United States at any time could obtain a trial *de novo* on the political faith of the applicant.

It is hardly conceivable that Congress intended that result under this earlier Act except for the narrow group of political creeds such as anarchy for which it specially provided. Chief Justice Hughes stated in his dissent in *United States* v. *Macintosh,* 283 U. S. 605, 635, that the

phrase "attachment to the principles of the Constitution" is a general one "which should be construed, not in opposition to, but in accord with, the theory and practice of our Government in relation to freedom of conscience." We should be mindful of that criterion in our construction of § 15. If findings of attachment which underly certificates may be set aside years later on the evidence, then the citizenship of those whose political faiths become unpopular with the passage of time becomes vulnerable. It is one thing to agree that Congress could take that step if it chose. See *Turner* v. *Williams*, 194 U. S. 279. But where it has not done so in plain words, we should be loath to imply that Congress sanctioned a procedure which in absence of fraud permitted a man's citizenship to be attacked years after the grant because of his political beliefs, social philosophy, or economic theories. We should not tread so close to the domain of freedom of conscience without an explicit mandate from those who specify the conditions on which citizenship is granted to or withheld from aliens. At least when two interpretations of the Naturalization Act are possible we should choose the one which is the more hospitable to that ideal for which American citizenship itself stands.

Citizenship can be granted only on the basis of the statutory right which Congress has created. *Tutun* v. *United States, supra.* But where it is granted and where all the express statutory conditions precedent are satisfied we should adhere to the view that the judgment of naturalization is final and conclusive except for fraud. Since the United States does not now contend that fraud vitiates this certificate the judgment below must be reversed.

Mr. Justice Rutledge, concurring:

I join in the Court's opinion. I add what follows only to emphasize what I think is at the bottom of this case.

Immediately we are concerned with only one man, William Schneiderman. Actually, though indirectly, the

decision affects millions. If, seventeen years after a federal court adjudged him entitled to be a citizen, that judgment can be nullified and he can be stripped of this most precious right, by nothing more than reëxamination upon the merits of the very facts the judgment established, no naturalized person's citizenship is or can be secure. If this can be done after that length of time, it can be done after thirty or fifty years. If it can be done for Schneiderman, it can be done for thousands or tens of thousands of others.

For all that would be needed would be to produce some evidence from which any one of the federal district judges could draw a conclusion, concerning one of the ultimate facts in issue, opposite from that drawn by the judge decreeing admission. The statute does not in terms prescribe "jurisdictional" facts.[1] But all of the important ones are "jurisdictional," or have that effect, if by merely drawing contrary conclusion from the same, though conflicting, evidence at any later time a court can overturn the judgment. An applicant might be admitted today upon evidence satisfying the court he had complied with all requirements. That judgment might be affirmed on appeal and again on certiorari here. Yet the day after, or ten years later, any district judge could overthrow it, on the same evidence, if it was conflicting or gave room for contrary inferences, or on different evidence all of which might have been presented to the first court.[2]

If this is the law and the right the naturalized citizen acquires, his admission creates nothing more than citizenship in attenuated, if not suspended, animation. He acquires but prima facie status, if that. Until the Gov-

---

[1] Cf., however, the concurring opinion of Mr. Justice Douglas, *ante*, p. 161.

[2] There is no requirement that the evidence be different from what was presented on admission or "newly discovered."

ernment moves to cancel his certificate and he knows the outcome, he cannot know whether he is in or out. And when that is done, nothing forbids repeating the harrowing process again and again, unless the weariness of the courts should lead them finally to speak *res judicata.*

No citizen with such a threat hanging over his head could be free. If he belonged to "off-color" organizations or held too radical or, perhaps, too reactionary views, for some segment of the judicial palate, when his admission took place, he could not open his mouth without fear his words would be held against him. For whatever he might say or whatever any such organization might advocate could be hauled forth at any time to show "continuity" of belief from the day of his admission, or "concealment" at that time. Such a citizen would not be admitted to liberty. His best course would be silence or hypocrisy. This is not citizenship. Nor is it adjudication.

It may be doubted that the framers of the Constitution intended to create two classes of citizens, one free and independent, one haltered with a lifetime string tied to its status. However that may be, and conceding that the power to revoke exists and rightly should exist to some extent, the question remains whether the power to admit can be delegated to the courts in such a way that their determination, once made, determines and concludes nothing with finality.

If every fact in issue, going to the right to be a citizen, can be reëxamined, upon the same or different proof, years or decades later; and if this can be done *de novo,* as if no judgment had been entered, whether with respect to the burden of proof required to reach a different decision or otherwise, what does the judgment determine? What does it settle with finality? If review is had and the admission is affirmed, what fact is adjudicated, if next day any or all involved can be redecided to the contrary? Can

Congress, when it has empowered a court to determine and others to review and confirm, at the same time or later authorize any trial court to overturn their decrees, for causes other than such as have been held sufficient to overturn other decrees? [3]

I do not undertake now to decide these questions. Nor does the Court. But they have a bearing on the one which is decided. It is a *judgment* which is being attacked. *Tutun* v. *United States,* 270 U. S. 568. Accordingly, it will not do to say the issue is identical with what is presented in a naturalization proceeding, is merely one of fact, upon which therefore the finding of the trial court concludes, and consequently we have no business to speak or our speaking is appellate intermeddling. That ignores the vital fact that it is a *judgment,* rendered in the exercise of the judical power created by Article III, which it is sought to overthrow,[4] not merely a grant like a patent to land or for invention.[5] Congress has plenary power over naturalization. That no one disputes. Nor that this power, for its application, can be delegated to the courts. But this is not to say, when Congress has so placed it, that body can decree in the same breath that the judgment rendered shall have no conclusive effect. Limits it may place. But that is another matter from making an adjudication under Article III merely an advisory opinion or prima facie evidence of the fact or all the facts determined. Congress has, with limited exceptions, plenary power over the jurisdiction of the federal courts.[6] But to confer the jurisdiction and at the same time nullify entirely the effects of its exercise are not matters heretofore thought,

---

[3] Cf. *United States* v. *Throckmorton,* 98 U. S. 61; *Kibbe* v. *Benson,* 17 Wall. 624. No such cause for cancellation is involved here.

[4] *Tutun* v. *United States,* 270 U. S. 568.

[5] Cf. *Johannessen* v. *United States,* 225 U. S. 227.

[6] Cf. *Lockerty* v. *Phillips,* 319 U. S. 182.

when squarely faced, within its authority.[7]   To say therefore that the trial court's function in this case is the same as was that of the admitting court is to ignore the vast difference between overturning a judgment, with its adjudicated facts, and deciding initially upon facts which have not been adjudged.   The argument made from the deportation statutes likewise ignores this difference.

It is no answer to say that Congress provided for the redetermination as a part of the statute conferring the right to admission and therefore as a condition of it.   For that too ignores the question whether Congress can so condition the judgment and is but another way of saying that a determination, made by an exercise of judicial power under Article III, can be conditioned by legislative mandate so as not to determine finally any ultimate fact in issue.

The effect of cancellation is to nullify the judgment of admission.   If it is a judgment, and no one disputes that it is, that quality in itself requires the burden of proof the court has held that Congress intended in order to overturn it.   That it is a judgment, and one of at least a coördinate court, which the cancellation proceeding attacks and seeks to overthrow, requires this much at least, that solemn decrees may not be lightly overturned and that citizens may not be deprived of their status merely because one judge views their political and other beliefs with a more critical eye or a different slant, however honestly and sincerely, than another.   Beyond this we need not go now in decision.   But we do not go beyond our function or usurp another tribunal's when we go this far.

---

[7] Cf. *United States* v. *Ferreira*, 13 How. 40; *Gordon* v. *United States*, 2 Wall. 561; *Id.*, 117 U. S. 697; *United States* v. *Jones*, 119 U. S. 477; *Pocono Pines Assembly Hotels Co.* v. *United States*, 73 Ct. Cls. 447; 76 Ct. Cls. 334; *Ex parte Pocono Pines Assembly Hotels Co.*, 285 U. S. 526.

The danger, implicit in finding too easily the purpose of Congress to denaturalize Communists, is that by doing so the status of all or many other naturalized citizens may be put in jeopardy. The other and underlying questions need not be determined unless or until necessity compels it.

MR. CHIEF JUSTICE STONE, dissenting:

The two courts below have found that petitioner, at the time he was naturalized, belonged to Communist Party organizations which were opposed to the principles of the Constitution, and which advised, advocated and taught the overthrow of the Government by force and violence. They have found that petitioner believed in and supported the principles of those organizations. They have found also that petitioner "was not, at the time of his naturalization . . ., and during the period of five years immediately preceding the filing of his petition for naturalization had not behaved as, a person attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same."

I think these findings are abundantly supported by the evidence, and hence that it is not within our judicial competence to set them aside—even though, sitting as trial judges, we might have made some other finding. The judgment below, cancelling petitioner's citizenship on the ground that it was illegally obtained, should therefore be affirmed. The finality which attaches to the trial court's determinations of fact from evidence heard in open court, and which ordinarily saves them from an appellate court's intermeddling, should not be remembered in every case save this one alone.

It is important to emphasize that the question for decision is much simpler than it has been made to appear. It is whether petitioner, in securing his citizenship by naturalization, has fulfilled a condition which Congress

has imposed on every applicant for naturalization—that during the five years preceding his application "he has behaved as a man . . . attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." [1]  Decision whether he was lawfully entitled to the citizenship which he procured, and consequently whether he is now entitled to retain it, must turn on the existence of his attachment to the principles of the Constitution when he applied for citizenship, and that must be inferred by the trier of fact from his conduct during the five-year period.  We must decide not whether the district court was compelled to find want of attachment, but whether the record warrants such a finding.

The question then is not of petitioner's opinions or beliefs—save as they may have influenced or may explain his conduct showing attachment, or want of it, to the principles of the Constitution.  It is not a question of freedom of thought, of speech or of opinion, or of present imminent danger to the United States from our acceptance as citizens of those who are not attached to the principles of our form of government.  The case obviously has nothing to do with our relations with Russia, where petitioner

---

[1] By § 4 of the Act of June 29, 1906, 34 Stat. 598, it is provided:

"Fourth. It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same.  In addition to the oath of the applicant, the testimony of at least two witnesses, citizens of the United States, as to the facts of residence, moral character, and attachment to the principles of the Constitution shall be required, and the name, place of residence, and occupation of each witness shall be set forth in the record."

was born, or with our past or present views of the Russian political or social system. The United States has the same interest as other nations in demanding of those who seek its citizenship some measure of attachment to its institutions. Our concern is only that the declared will of Congress shall prevail—that no man shall become a citizen or retain his citizenship whose behavior for five years before his application does not show attachment to the principles of the Constitution.

The Constitution has conferred on Congress the exclusive authority to prescribe uniform rules governing naturalization. Article I, § 8, cl. 4. Congress has exercised that power by prescribing the conditions, in conformity to which aliens may obtain the privilege of citizenship. Under the laws and Constitution of the United States, no person is given any right to demand citizenship, save upon compliance with those conditions. "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *United States* v. *Ginsberg*, 243 U. S. 472, 474. And whenever a person's right to citizenship is drawn in question, it is the judge's duty loyally to see to it that those conditions have not been disregarded.

The present suit by the United States, to cancel petitioner's previously granted certificate of citizenship, was brought pursuant to an Act of Congress (§ 15 of the Act of June 29, 1906, 34 Stat. 601), enacted long prior to petitioner's naturalization. Section 15 authorizes any court by a suit instituted by the United States Attorney to set aside a certificate of naturalization "on the ground of fraud or on the ground that such certificate of citizenship was illegally procured." Until now this Court, with-

out a dissenting voice, has many times held that in a suit under this statute it is the duty of the court to render a judgment cancelling the certificate of naturalization if the court finds upon evidence that the applicant did not satisfy the conditions which Congress had made prerequisite to the award of citizenship. *Johannessen* v. *United States,* 225 U. S. 227; *Luria* v. *United States,* 231 U. S. 9; *Maibaum* v. *United States,* 232 U. S. 714; *United States* v. *Ginsberg,* 243 U. S. 472; *United States* v. *Ness,* 245 U. S. 319; *Maney* v. *United States,* 278 U. S. 17, 23; *Schwinn* v. *United States,* 311 U. S. 616.

Provision for such a review of the judgment awarding citizenship is within the legislative power of Congress and plainly is subject to no constitutional infirmity, *Johannessen* v. *United States, supra,* 236–40, especially where, as here, the statute antedated petitioner's citizenship and the review was thus a condition of its award. *Luria* v. *United States, supra,* 24. Our decisions have uniformly recognized that Congress, which has power to deny citizenship to aliens altogether, may safeguard the grant of this privilege, precious to the individual and vital to the country's welfare, by such procedure for determining the existence of indispensable requisites to citizenship as has been established in § 15. "No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the Government may challenge it as provided in § 15 and demand its cancellation unless issued in accordance with such requirements. If procured when prescribed qualifications have no existence in fact it is illegally procured; a manifest mistake by the judge cannot supply these nor render their existence non-essential." *United States* v. *Ginsberg, supra,* 475. Speaking for a unanimous Court, Mr. Justice Brandeis thus stated what was, until today, the settled law: "If a certificate is procured when the pre-

scribed qualifications have no existence in fact, it may be cancelled by suit." *Tutun* v. *United States,* 270 U. S. 568, 578. Congress has not seen fit to interpose any statute of limitations. And there is no suggestion that the Government was derelict in not bringing the suit earlier or that petitioner has been prejudiced by delay. Hence the issue before us is whether petitioner, when naturalized, satisfied the statutory requirements. It is the same issue as would be presented by an appeal from a judgment granting or denying naturalization upon the evidence here presented, although it may be assumed that in this proceeding the burden of proof rests on the Government, which has brought the suit, to establish petitioner's want of qualifications.

We need not stop to consider whether petitioner's failure, in his naturalization proceeding, to disclose facts which could have resulted in a denial of his application, constituted fraud within the meaning of the statute. For present purposes it is enough that the evidence supports the conclusion of the courts below as to petitioner's want of attachment to the principles of the Constitution, and, that § 15 has, ever since its enactment in 1906, been construed by this Court as requiring certificates of citizenship to be cancelled as illegally procured whenever the court finds on evidence that at the time of naturalization the applicant did not in fact satisfy the statutory prerequisites.

To meet the exigencies of this case, it is now for the first time proposed by the concurring opinion of Mr. Justice Douglas that a new construction be given to the statute which would preclude any inquiry concerning the fact of petitioner's attachment to the Constitution. It is said that in a § 15 proceeding the only inquiry permitted, apart from fraud, is as to the regularity of the naturalization proceedings on their face; that—however

much petitioner fell short of meeting the statutory requirements for citizenship—if he filed, as he did, pro forma affidavits of two persons, barely stating that he met the statutory requirements of residence, moral character and attachment to the Constitution, and if the court on the basis of the affidavits made the requisite findings and order, then all further inquiry is foreclosed.

To this easy proposal for the emasculation of the statute there are several plain and obvious answers.

Section 15 authorizes and directs the Government to institute the suit to cancel the certificate of naturalization on the ground of fraud or on the ground that the certificate was illegally procured. Until now it has never been thought that a certificate of citizenship procured by one who has not satisfied the statutory conditions for citizenship, is nevertheless lawfully procured. But the concurring opinion of Mr. Justice Douglas suggests that, for purposes of § 15, "attachment to the principles of the Constitution" is not a condition of becoming a citizen. It suggests that the statute is satisfied, even though the applicant was never in fact attached to the principles of the Constitution, so long as such attachment was made to appear, from pro forma affidavits, to the satisfaction of the naturalization court. This is said to be the case regardless of whether in fact the affidavits, and the certificate of citizenship based on them, are wholly mistaken; and despite the fact that the naturalization proceeding, as apparently it was here, is an ex parte proceeding in which the Government is not represented.

It would seem passing strange that Congress—which authorized cancellation of citizenship under § 15 for failure to hold the naturalization hearing in open court instead of in the judge's chambers (*United States* v. *Ginsberg, supra*), or for failure to present the requisite certificate of arrival in this country (*Maney* v. *United States,*

*supra*)—should be thought less concerned with the applicant's attachment to the principles of the Constitution and that he be well disposed to the good order and happiness of the United States. For what could be more important in the selection of citizens of the United States than that the prospective citizen be attached to the principles of the Constitution?

Moreover, if in the absence of fraud the finding of the naturalization court in this case is final and hence beyond the reach of a § 15 proceeding, it would be equally final in the case of a finding, contrary to the actual fact, that the applicant had been for five years a continuous resident in the United States, since that requirement too is set forth in the sentence of § 4 which provides that "it shall be made to appear to the satisfaction of the court." Yet it is settled that a certificate of citizenship based on a mistaken finding of five years residence is subject to revocation. *United States* v. *Ginsberg, supra.* And in *Schwinn* v. *United States, supra,* it appeared, from extrinsic evidence first offered in a § 15 proceeding, that the witnesses at the naturalization hearing had been mistaken as to the length of time they had known the applicant, and that for a part of the five-year period no witness had been produced with actual knowledge of the applicant's residence or qualifications. We held, without dissent, 311 U. S. 616, "that the certificate of citizenship was illegally procured," and for that reason we affirmed a judgment cancelling it.[2] If we are to give effect to the language and purpose of Congress, it would seem that we must reach the same result in the case of the naturalization court's mistaken or unwarranted finding of attachment to the principles of the Constitution, even though

---

[2] The district court's decision was based on both fraud and illegality. The circuit court of appeals relied upon fraud alone, 112 F. 2d 74, but our affirmance was rested "on the sole ground" of illegality.

the conduct of the applicant and his witnesses at the naturalization hearing fell short of perjury.

The purpose of § 15—like that of § 11, which authorizes the Government to appear in a naturalization proceeding to contest the application—is not merely to insure the formal regularity of the proceeding, but to protect the United States from the injury which would result from the acceptance as citizens of any who are not lawfully entitled to become citizens. Congress left the naturalization proceeding simple and inexpensive, by permitting it ordinarily to be conducted ex parte. Thus approximately 200,000 certificates of naturalization were issued during the year in which petitioner became a citizen. Annual Report of the Secretary of Labor, 1940, p. 115. But by § 15 Congress afforded the Government an independent opportunity to inquire into any naturalization if upon later scrutiny it appeared that the certificate of citizenship had not been lawfully procured. As the Court declared in *United States* v. *Ness, supra,* 327, "§ 11 and § 15 were designed to afford cumulative protection against fraudulent or illegal naturalization." All this was made abundantly clear by decisions of this Court more than twenty-five years ago. See *Johannessen* v. *United States, supra; Luria* v. *United States, supra; United States* v. *Ginsberg, supra; United States* v. *Ness, supra,* 325–27. In the intervening years Congress has often revised the naturalization laws, but it has not thought it appropriate to modify this Court's interpretation of the function of § 15 in the naturalization procedure.

This is persuasive that the interpretation of § 15 now proposed defies the purpose and will of Congress. It is inconceivable that Congress should have intended that a naturalized citizen's attachment to the principles of the Constitution—the most fundamental requirement for citizenship—should be the one issue which, in the absence

of fraud, the Government is foreclosed from examining. To limit the Government to proof of fraud in such cases is to read "illegality" out of the statute in every instance where an alien demonstrably not attached to the principles of the Constitution has procured a certificate of citizenship. Even if we were to recast an Act of Congress in accordance with our own notions of policy, it would be difficult to discover any considerations warranting the adoption of a device whose only effect would be to make certain that persons never entitled to the benefits of citizenship could secure and retain them. That could not have been the object of Congress in enacting § 15.

As we are not here considering whether petitioner's certificate of naturalization was procured by fraud, there is no occasion, and indeed no justification, for importing into this case the rule, derived from land fraud cases, that fraud, which involves personal moral obliquity, must be proved by clear and convincing evidence. The issue is not whether petitioner committed a crime but whether he should be permitted to enjoy citizenship when he has never satisfied the basic conditions which Congress required for the grant of that privilege. We are concerned only with the question whether petitioner's qualifications were so lacking that he was not lawfully entitled to the privilege of citizenship which he has procured. There is nothing in § 15, nor in any of our numerous decisions under it, to suggest that such an issue is to be tried as fraud is tried, or that it is not to be resolved, as are other cases, by the weight of evidence. No plausible reason has been advanced why it should not be. But the point need not be labored, for no matter how it is determined it can give no aid or comfort to petitioner. The evidence in this case to which I shall refer and on which the courts below were entitled to rely is clear, not speculative; and since petitioner himself has not challenged it, the trial court was

entitled to accept it as convincing, which it evidently did.

The statute does not, as seems to be suggested, require as a condition of citizenship that a man merely be capable of attachment to the principles of the Constitution—a requirement which presumably all mankind could satisfy. It requires instead that the applicant be in fact attached to those principles when he seeks naturalization, and § 15 makes provision for the Government to institute an independent suit, subsequent to naturalization, to inquire whether that condition was then in fact fulfilled. Congress has exhibited no interest in petitioner's capabilities. Nor did Congress require only that it be not impossible for petitioner to have an attachment to the principles of the Constitution. The Act specifies the fact of attachment as the test, requiring this to be affirmatively shown by the applicant; and by § 15 Congress provided a means for the United States to ascertain that fact by a judicial determination.

The prescribed conditions for the award of citizenship by naturalization are few and readily understood, and we must accept them as the expression of the Congressional judgment that aliens not satisfying those requirements are not worthy to be admitted to the privilege of citizenship. Congress has declared that before one is entitled to that privilege he must take the oath of allegiance "that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." Act of June 29, 1906, § 4 (Third), 34 Stat. 597. And as I have said, the applicant must make it appear to the court admitting him to citizenship that for the five years preceding the date of his application he has resided continuously within the United States and "that during that time he has behaved as a man of good

moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same."

Moreover, at the time of petitioner's naturalization, the statutes of the United States excluded from admission into this country "aliens who believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States . . ." Act of October 16, 1918, § 1, 40 Stat. 1012, as amended by subsection (c) of the Act of June 5, 1920, 41 Stat. 1008, 1009. The statutes also barred admission to the United States of "aliens who . . . knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed . . . any written or printed matter . . . advising, advocating, or teaching: (1) the overthrow by force or violence of the Government of the United States . . ." *Ibid.*, subsection (d). And by § 2 of the Act of October 16, 1918, it was provided that any alien who, after entering the United States, "is found . . . to have become thereafter, a member of any one of the classes of aliens" just enumerated, shall be taken into custody and deported. See *Kessler* v. *Strecker*, 307 U. S. 22. Quite apart from the want of attachment to the Constitution and the consequent disqualification of such aliens for citizenship, their belonging to any of these classes would disqualify them for citizenship since their presence in the United States, without which they cannot apply for citizenship, would be unlawful. And in the light of the evidence—presently to be discussed— even the Court's opinion concedes (p. 153) "We do not say that a reasonable man could not possibly have found, as the district court did, that the Communist Party in 1927 actively urged the overthrow of the Government by

force and violence." In addition, the evidence makes it clear beyond all reasonable doubt that petitioner, up to the time of his naturalization, was an alien who knowingly circulated or distributed, or caused to be circulated or distributed, printed matter advocating the overthrow of the Government by force or violence.

Wholly apart from the deportation statute, the judgment should be affirmed because the trial court was justified in finding that petitioner, in 1927, was not and had not been attached to the principles of the Constitution. My brethren of the majority do not deny that there are principles of the Constitution. The Congress of 1795, which passed the statute requiring an applicant for naturalization to establish that he has "behaved as a man . . . attached to the principles of the Constitution" (1 Stat. 414), evidently did not doubt that there were. For some of its members had sat in the Constitutional Convention. In the absence of any disclaimer I shall assume that there are such principles and that among them are at least the principle of constitutional protection of civil rights and of life, liberty and property, the principle of representative government, and the principle that constitutional laws are not to be broken down by planned disobedience. I assume also that all the principles of the Constitution are hostile to dictatorship and minority rule; and that it is a principle of our Constitution that change in the organization of our government is to be effected by the orderly procedures ordained by the Constitution and not by force or fraud. With these in mind, we may examine petitioner's behavior as disclosed by the record, during the five years which preceded his naturalization, in order to ascertain whether there was basis in the evidence for the trial judge's findings. In determining whether there was evidence supporting the finding of petitioner's want of attachment to constitutional principles, courts must look, as the statute admonishes, to see whether in the five-

year period petitioner behaved as a man attached to the principles of the Constitution. And we must recognize that such attachment or want of it is a personal attribute to be inferred from all the relevant facts and circumstances which tend to reveal petitioner's attitude toward those principles.

. Petitioner, who is an educated and intelligent man, took out his first papers in 1924, when he was eighteen years of age, and was admitted to citizenship on June 10, 1927, when nearly twenty-two. Since his sixteenth year he has been continuously and actively engaged in promoting in one way or another the interests of various Communist Party organizations affiliated with and controlled as to their policy and action by the Third International, the parent Communist organization, which had its headquarters and its Executive Committee in Moscow.[3]

---

[3] During the whole period relevant to this litigation, the Communist Party was a world organization, known as the Third Communist International (or Comintern), created in 1919, of which the Communist Parties in each country were sections. The supreme governing body of the Third Communist International—which exercised control of the Party program, tactics and organization—was the World Congress of the Communist International. Between meetings of the Congress its authority was vested in the Executive Committee of the Communist International. The resolutions of the Congress, and between meetings those of the Executive Committee, were binding on all sections. In the United States the Workers Party of America, a Communist organization, was established in 1921. It was affiliated with the Communist International, and had sent delegates to the Third World Congress of the International earlier in that year. The Workers Party of America has been since continued, and successively known as the Workers (Communist) Party and as the Communist Party of the United States of. America. The Party sent accredited representatives to the Communist International and recognized the leadership of the International. It was affiliated with the Third International, of which it constituted a section. All the events with which this litigation is concerned occurred long prior to the dissolution of the Comintern in May 1943.

The evidence shows petitioner's loyalty to the Communist Party organizations; that as a member of the Party he was subject to and accepted its political control, and that as a Party member his adherence to its political principles and tactics was required by its constitution.

Petitioner was born in Russia on August 1, 1905, and came to the United States in 1907 or 1908. In 1922, when a 16-year old student at a night high school in Los Angeles, he became one of the organizers and charter members of the Young Workers League of California. For two or three years—and during the five-year period which we are examining—he was educational director of the League; it was his duty "to organize forums and studies for classes." "My job was to register students in the classes and send out notices for meetings; in other words, to organize the educational activities of the League for which instructors were supplied." The outlines of the curriculum of this educational program were established by the League's national committee. The League (whose name was later changed to the Young Communist League) was affiliated with the Communist International.[4] In 1928, just after he was naturalized, petitioner became "organizer" or "director" of the League—"I was the official spokesman for the League and directed its administrative and political affairs and educational affairs." Petitioner was a delegate to the League's National Con-

---

[4] The Young Workers League was affiliated with the Young Communist International and the Communist International. It sent delegates to the Congress of the Young Communist International. It was also closely related to the Workers Party, and sent delegates to the Party Conventions. At its Third National Convention, the Party adopted the following resolution:

"The task of reaching the youth with the message of Communism, of interesting them in our cause and organizing them for the militant struggle against the existing social order and its oppression and exploitation is of major importance for the whole Communist movement. In carrying on this work the Young Workers League is pre-

vention in 1922, and again in 1925. Meanwhile, on February 8, 1924, he had filed a declaration of intention to become a citizen of the United States.

At the end of 1924, petitioner joined the Workers Party (which later changed its name to the Workers Communist Party and still later to the Communist Party of the United States of America). The Party was a section of the Third International. The Party constitution, at the time petitioner became a member, provided (Article III, § 1) that "every person who accepts the principles and tactics of the Workers Party of America and agrees to submit to its discipline and engage actively in its work shall be eligible to membership." Applicants for membership were required (Article III, § 2) to sign an application card reading as follows: "The undersigned declares his adherence to the principles and tactics of the Workers Party of America as expressed in its program and constitution and agrees to submit to the discipline of the party and to engage actively in its work." It was likewise provided (Article X, §§ 1, 2) that "all decisions of the governing bodies of the Party shall be binding upon the membership and subordinate units of the organization," and that "any member or organization violating the decisions of the Party shall be subject to suspension or expulsion."[5] During 1925 and 1926 petitioner was "cor-

---

paring the fighters for Communism who will soon stand in the ranks of the Party as part of its best fighters."

The Second Year of the Workers Party of America. Report of The Central Executive Committee to the Third National Convention. Held in Chicago, Illinois, Dec. 30, 31, 1923 and Jan. 1, 2, 1924. Theses, Program, Resolutions. Published by the Literature Department, Workers Party of America, 1009 N. State St., Chicago, Ill. (p. 122.)

[5] Program and Constitution, Workers Party of America. Adopted at National Convention, New York City, December 24-25-26-27, 1921. Amended at National Convention, Chicago, Ill., December 30-

responding secretary" of the Workers Party in Los
Angeles. As such, he wrote down the minutes and sent
out communications for meetings; and a letter which he
signed in his capacity as "city central secretary" indicates
that he was in charge of outgoing correspondence with
affiliates of the Party. In 1925 he attended the Party
convention.

After his naturalization, petitioner attended the Sixth
World Congress of the Communist International, at
Moscow, in 1928; and from 1929 to 1930 he was district
organizational secretary of the Party for a district which
included Arizona, Nevada and California. At various
subsequent times he was district organizer in Connecti-
cut, in Minnesota, and in California. He ran twice as
the Party's candidate for governor of Minnesota. He
held other official positions in the Party, and at the time
of the hearing in the district court was California State
Secretary of the Party and a member of the State Central
Committee. These facts, while not directly probative of
his behavior during the five-year period 1922–1927, at
least establish that his early devotion to the Party organi-
zations was not transitory, nor inconsistent with his gen-
uine and settled convictions.

The evidence shows and it is not denied that the Com-
munist Party organization at the time in question was
a revolutionary party having as its ultimate aim generally,
and particularly in England and the United States, the
overthrow of capitalistic government, and the substitu-
tion for it of the dictatorship of the proletariat. It sought
to accomplish this through persistent indoctrination of
the people in capitalistic countries with Party principles,
by the organization in those countries of sections of the

31, 1923, and January 1, 1924. Published by Literature Department,
Workers Party of America, 1113 W. Washington Boulevard, Chi-
cago, Ill.

Third International, by systematic teaching of Party principles at meetings and classes held under Party auspices, and by the publication and distribution of Communist literature which constituted one of the basic principles of Party action.

In accordance with the policy established at its Second World Congress in 1920, the Party press was brought under Party control through ownership of the various publication agencies. Strict adherence to Party principles was demanded of all publications, which were required to be edited by Party members of proved loyalty to the proletarian revolution. Propaganda was required to conform to the program and decisions of the Third International. Editors were removed and Party members expelled for noncompliance. Publications not conforming to Party principles were barred from Party classes.

Many such Communist Party publications were introduced at the trial and constitute a large part of the evidence in this case. Perusal of the record can leave no doubt of petitioner's unqualified loyalty to the Communist Party. His continuous services to the Party for twenty years in a great variety of capacities, and his familiarity with Party programs and literature, are convincing proof of his complete devotion to Communist Party principles, and his desire to advance them. Throughout he has been a diligent student of Party publications. Many of them were used in the Communist classes of which he was educational director in the years immediately preceding his naturalization. All were particularly brought to his attention as they were introduced in evidence and excerpts relative to the issues were discussed in open court. Except as may be later noted, he did not deny familiarity with them or disavow their teachings. They were the official exposition of the doctrines of the Party to which he had formally pledged his alle-

giance, diligently disseminated by him for the indoctrination of his fellow countrymen, especially the members of the Youth organizations of the Party. In the circumstances, and especially in the absence of any disavowal by petitioner or the assertion by him of ignorance of the principles which they proclaimed, they are persuasive evidence of the nature and extent of his want of attachment to the principles of the Constitution. In appraising them in this aspect it will be most useful to state in somewhat summary form some of the teachings of these publications, classified with reference to principles of the Constitution to which they relate, and to give a few typical examples, of which many more could be given from the evidence.

Unless otherwise noted, I shall refer only to those with which petitioner was familiar and which were published under the auspices of the Party and by its official publication agencies.

As I have said, it is not questioned that the ultimate aim of the Communist Party in 1927 and the years preceding was the triumph of the dictatorship of the proletariat and the consequent overthrow of capitalistic or bourgeois government and society. Attachment to such dictatorship can hardly be thought to indicate attachment to the principles of an instrument of government which forbids dictatorship and precludes the rule of the minority or the suppression of minority rights by dictatorial government. But the Government points especially to the methods by which that end was to be achieved to show that those who pursue or advocate such methods exhibit their want of attachment to the principles of the Constitution. Methods repeatedly and systematically advocated, in the Communist Party literature to which I have referred, include first a softening up process by which the breakdown and disintegration of capitalistic governments was to be achieved by systematic

and general resort to violation of the laws, and second, the overthrow of capitalistic governments by force and violence.

It was proclaimed that "For all countries, even for most free 'legal' and 'peaceful' ones in the sense of a lesser acuteness in the class struggle, the period has arrived, when it has become absolutely necessary for every Communist party to join systematically lawful and unlawful work, lawful and unlawful organization. . . . The class struggle in almost every country of Europe and America is entering the phase of civil war. Under such conditions the Communists can have no confidence in bourgeois laws. They should create everywhere a parallel illegal apparatus, which at the decisive moment should do its duty by the party, and in every way possible assist the revolution. In every country where, in consequence of martial law or of other exceptional laws, the Communists are unable to carry on their work lawfully, a combination of lawful and unlawful work is absolutely necessary." [6]  "Opposition

---

[6] See pp. 18, 28, of Statutes, Theses and Conditions of Admission to the Communist International. Adopted by the Second Congress of the Communist International, July 17 to August 7, 1920. The edition of this document in evidence in the present case was published in March, 1923, under the auspices of the Workers Party of America, and contained the following statement on the inside front cover:

"The Workers Party declares its sympathy with the principles of the Communist International and enters the struggle against American capitalism, the most powerful of the capitalist groups, under the inspiration and leadership of the Communist International.

"It rallies to the call 'WORKERS OF THE WORLD UNITE.' "

Petitioner testified that he had no recollection of "this particular edition" but that "I have no doubt that possibly a pamphlet" like it was sold in Party bookstores. This document was marked for identification and the court later denied a motion to exclude it and other exhibits from the evidence. During the trial petitioner's counsel twice referred to the document as having been put in evidence. Petitioner's counsel included it, with all other exhibits in evidence or offered for identification, in his designation of the record to be made

in principle to underground (illegal) work and an unwillingness to understand the absolute necessity for a Communist Party of combining legal with illegal work" was in fact one ground for expulsion from the Party of a minority faction.[7] Advocacy of illegal conduct generally was accompanied by advocacy of particular types of illegality. The Party was instructed to arouse workers to "mass violation" of an injunction "whenever and wherever an injunction is issued by courts against strikers."[8] In the literature of the period now in question unlawful tactics were particularly to be directed toward government armed forces. In addition to "systematic unlawful work," "it is especially necessary to carry on unlawful work in the army, navy, and police."[9] Refusal to participate in "persistent and systematic propaganda and agitation" in the army was "equal to treason to the revo-

---

up in the circuit court of appeals. It was so included by order of the court. Despite the Government's oversight in failing formally to say that the exhibit was being introduced in evidence, it obviously was deemed to be in evidence by both the parties and the trial court. The exhibit is unquestionably relevant and competent evidence, and it became a part of the record before the courts below.

[7] See p. 94 of The 4th National Convention of the Workers (Communist) Party of America. Held in Chicago, Ill., August 21–30, 1925. Published by the Daily Worker Publishing Co., 1113 W. Washington Blvd., Chicago, Ill. The publisher's notice inside the back cover stated that this pamphlet was "absolutely indispensable to any member of the party." The pamphlet, which was the official report of the convention, was sold and circulated by the Party in Los Angeles in 1925. Petitioner disclaimed familiarity with the literature of this convention, but testified that he had attended the convention. He also testified he was in agreement with the general program and principles of the Workers (Communist) Party.

[8] *Ibid.* p. 107. This was part of a resolution, adopted unanimously by the Party Convention, relating to "Party Policies for Trade Union Work."

[9] Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*), p. 19.

lutionary cause, and incompatible with affiliation with the Third International," [10] and this because "it is necessary, above all things, to undermine and destroy the army in order to overcome the bourgeoisie." [11]

There is abundant documentary evidence of the character already described to support the court's finding that the Communist Party organizations, of which petitioner was a member, diligently circulated printed matter which advocated the overthrow of the Government of the United States by force and violence, and that petitioner aided in that circulation and advocacy. From the beginning, and during all times relevant to this inquiry, there is evidence that the Communist Party organizations advocated the overthrow of capitalistic governments by revolution to be accomplished, if need be, by force of arms. We need not stop to consider the much discussed question whether this meant more than that force was to be used if established governments should be so misguided as to refuse to make themselves over into proletarian dictatorships by amendment of their governmental structures, or should have the effrontery to defend themselves from lawless or subversive attacks. For in any case the end contemplated was the overthrow of government, and the measures advocated were force and violence.

---

[10] *Ibid.* p. 28.

[11] A B C of Communism, p. 69. This was written by N. Bucharin & E. Preobraschensky, in 1919, translated into English in June, 1921, and published between 1920 and 1924 by the Lyceum-Literature Department, Workers Party of America, 799 Broadway, New York City. There was evidence that this pamphlet was a basic work of Party study classes in 1924 and 1925; that it was expressly designed for such purposes, was officially circulated by the Party, and was still advertised by the Workers Library Publishers in 1928. Petitioner testified that he had read the work and was familiar with it, although he said that the authors had later been expelled from the Russian Communist Party.

The fountainhead of Communist principles, the Communist Manifesto, published by Marx and Engels in 1848, had openly proclaimed that Communist ends could be attained "only by the forcible overthrow of all existing social conditions." After 1920 these teachings were revived and restated in Party publications which, in the period we are now considering, were used in the Communist educational program that petitioner was directing. They recognized that "the proletarian revolution is impossible without the violent destruction of the bourgeois governmental machine and the putting of a new one in its place"; that "the dictatorship of the proletariat cannot be the result of the peaceful development of bourgeois society and democracy; it can be the result only of the destruction of the bourgeois army and State machine, the bourgeois administrative apparatus and the whole bourgeois political system"; that "the dictatorship of the proletariat is born not of the bourgeois state of things, but of its destruction after the overthrow of the bourgeoisie, of the expropriation of landed proprietors and capitalists, of the socialization of the essential instruments and means of production, of the development of the proletarian revolution through violence. The dictatorship of the proletariat is the revolutionary power resting on violence against the bourgeoisie." [12]

Petitioner testified that at the time of his naturalization he subscribed to the philosophy and principles of socialism as manifested in the writings of Lenin. *The State*

---

[12] The Theory and Practice of Leninism, by Stalin, pp. 33, 32, 30–31. Published for the Workers Party of America by the Daily Worker Publishing Co., Chicago, Ill. This pamphlet was used in Communist Party classes in 1924 and 1925, and was circulated by the Literature Department of the Communist Party and sold in Party bookshops. Five thousand copies were published between January 15 and August 1, 1925.

*and Revolution,* by Lenin, with which petitioner was familiar, and which was circulated by the Literature Department of the Communist Party in 1924 and 1925 and used by Communist Party classes, declared: "The necessity of systematically fostering among the masses this and only this point of view about violent revolution lies at the root of the whole of Marx's and Engels' teaching, and it is just the neglect of such propaganda and agitation both by the present predominant Social-Chauvinists and the Kautskian schools that brings their betrayal of it into prominent relief." [13] And in order that there might be no misunderstanding of the term "revolution," Engels' definition of revolution was revived and restated as follows: "Revolution is an act in which part of the population forces its will on the other parts by means of rifles, bayonets, cannon, i. e., by most authoritative means. And the conquering party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries." [14] "That which before the victory of the proletariat seems but a theoretical difference of opinion on the question of 'democracy,' becomes inevitably on the morrow of the victory, a question which can only be decided by force of arms." [15] "The working class cannot achieve victory over the bourgeois by means of the general strike alone, and by the policy of folded arms. The proletariat must resort to an armed uprising." [16] "To say that the revolution can be achieved without civil war is to say that a 'peaceful' revolution is possible. . . . Marx was a believer in civil war—that is, the armed struggle of

[13] P. 16, new edition, April, 1924. Published for the Workers Party of America by The Daily Worker Publishing Co., Chicago, Ill.
[14] *Ibid.,* p. 44.
[15] Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*), p. 15.
[16] *Ibid.,* p. 36.

the proletariat against the bourgeoisie. . . . The teachers of Socialism took the revolution very seriously. It was clear to them that the proletariat could not convert the bourgeoisie, and that the workers would have to impose their will upon their enemies through a war carried on by guns and bayonets." [17]

The Party teachings in this and other publications were that revolution by force of arms was a universal principle and consequently one which embraced the United States, and obviously was intended to do so when taught in Communist classes in the United States. Communist publications in evidence were at pains to point out that "Marx's limitation with regard to the 'continent' has furnished the opportunists and mensheviks of every country with a pretext for asserting that Marx admitted the possibility of a peaceful transformation of bourgeois democracy into proletariat democracy, at least [in] some countries (England and America). . . . But now the situation in these countries is radically different. Imperialism has reached its apogee there, and there militarism and bureaucracy are sovereign. In consequence Marx's restriction no longer applies." [18]

In order to determine whether petitioner's behavior established his attachment to the principles of the Constitution, we are entitled to consider the political system which his Party proposed to establish and toward which his own efforts in promoting the Communist cause were directed. About this there is and can be no serious dispute. Under the new system existing constitutional principles were to be abandoned. In the new government to be established by the Communists, the freedoms guaran-

---

[17] A B C of Communism (see note 12, *supra*), pp. 109–10.

[18] The Theory and Practice of Leninism, by Stalin (see note 12, *supra*), p. 32. To the same effect see The State and Revolution, by Lenin (note 13, *supra*), p. 26.

teed by the Bill of Rights were to be ended. ". . . There can be no talk of 'freedom' for everybody. The dictatorship of the proletariat is incompatible with the freedom of the bourgeoisie. The dictatorship is, in fact, necessary to deprive the bourgeoisie of their freedom, to chain them hand and foot in order to make it absolutely impossible for them to fight the revolutionary proletariat."[19] There was to be "immediate and unconditional confiscation of the estates of the landowners and big landlords" and "no propaganda can be admitted in the ranks of the Communist parties in favor of an indemnity to be paid to the owners of large estates for their expropriation."[20] The new state was not to include "representatives of the former ruling classes."[21] "The dictatorship of the proletariat cannot be a 'complete democracy, a democracy for *all,* for rich and poor alike; it has to be a State that is democratic, but only *for the proletariat and the property-less,* a State that is dictatorial, but only *against the bourgeoisie.'* . . . Under the dictatorship of the proletariat, democracy *is proletarian:* it is democracy for the exploited majority, based on the limitation of the rights of the exploiting minority and directed against this minority."[22]

The aims of the Communists could be achieved only by "the annihilation of the entire bourgeois governmental apparatus, parliamentary, judicial, military, bureaucratic, administrative, municipal," and it was necessary for the Communists "to break and destroy" the "apparatus."[23] The annihilation of the existing political structure was

---

[19] A B C of Communism (see note 11, *supra*), pp. 65–66.

[20] Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*), p. 82.

[21] *Ibid.,* p. 46.

[22] The Theory and Practice of Leninism, by Stalin (see note 12, *supra*), pp. 31–32.

[23] Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*), pp. 11, 44.

deemed as necessary in the United States as elsewhere.[24] If elected to public office the Communist was directed to "facilitate this task of destruction" of the existing "apparatus," since the "bourgeois State organizations" were to be utilized only "with the object of destroying them." [25]

It is unnecessary to give further examples of the teachings of Communist Party organizations with which the documentary evidence is shot through and through. Appended to this opinion are excerpts from two exhibits. These have been chosen, not because they prove more than others but only because they express in short form ideas which permeate all. The evidence, as a whole, and the exhibits which we have especially mentioned, show a basis for finding in the Party teachings, during the period in question, an unqualified hostility to the most fundamental and universally recognized principles of the Constitution. On the argument we were admonished that petitioner favored change in our form of government, which is itself a principle of the Constitution, since the Constitution provides for its own amendment, and that in any case the Communist Party had greatly modified its aims in more recent years. It is true that the Constitution provides for its own amendment by an orderly procedure but not through the breakdown of our governmental system by lawless conduct and by force. It can hardly satisfy the requirement of "attachment to the principles of the Constitution" that one is attached to the means for its destruction. And whether at some time after 1927 the Party may have abandoned these doctrines is immaterial.

It would be little short of preposterous to assert that vigorous aid knowingly given by a pledged Party member

[24] See note 18, *supra.*

[25] Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*), pp. 44, 45, 46.

in disseminating the Party teachings, to which reference has been made, is compatible with attachment to the principles of the Constitution. On the record before us it would be difficult for a trial judge to conclude that petitioner was not well aware that he was a member of and aiding a party which taught and advocated the overthrow of the Government of the United States by force and violence. It would be difficult also to find as a fact that petitioner behaved as a man attached to the principles of the Constitution. The trial judge found that he did not. And the same evidence would seem to furnish plain enough support for the trial judge's further finding that petitioner did not behave as a man attached "to the good order and happiness" of the United States.

Petitioner's pledge of adherence to Communist Party principles and tactics, and his membership in the Communist organizations, were neither passive nor indolent. His testimony shows clearly that during the crucial years he was a young man of vigorous intellect and strong convictions. He spent his time actively arranging for the dissemination of a gospel of which he never has asserted either ignorance or disbelief. His wide acquaintance with Party literature, and his zealous promotion of Party interests for many years, preclude the supposition that he did not know the character of its teachings and did not aid in their advocacy. They are persuasive that he was without attachment to the constitutional principles which those teachings aimed to destroy. Yet the Court's opinion seems to tell us that the trier of fact must not examine petitioner's gospel to find out what kind of man he was, or even what his gospel was; that the trier of fact could not "impute" to petitioner any genuine attachment to the doctrines of these organizations whose teachings he so assiduously spread. It might as well be said that it is impossible to infer that a man is attached to the principles of a religious movement from the fact that he conducts

its prayer meetings, or, to take a more sinister example, that it could not be inferred that a man is a Nazi and consequently not attached to constitutional principles who, for more than five years, had diligently circulated the doctrines of *Mein Kampf*.

In neither case of course is the inference inevitable. It is possible, though not probable or normal, for one to be attached to principles diametrically opposed to those, to the dissemination of which he has given his life's best effort. But it is a normal and sensible inference which the trier of fact is free to make that his attachment is to those principles rather than to constitutional principles with which they are at war. A man can be known by the ideas he spreads as well as by the company he keeps. And when one does not challenge the proof that he has given his life to spreading a particular class of well-defined ideas, it is convincing evidence that his attachment is to them rather than their opposites. In this case it is convincing evidence that petitioner, at the time of his naturalization, was not entitled to the citizenship he procured because he was not attached to the principles of the Constitution of the United States and because he was not well disposed to the good order and happiness of the same.

Mr. Justice Roberts and Mr. Justice Frankfurter join in this dissent.

APPENDIX.

Excerpts from Exhibit 26—Statutes, Theses and Conditions of Admission to the Communist International (see note 6, *supra*):

"The Communist International makes its aim to put up an armed struggle for the overthrow of the International bourgeoisie and to create an International Soviet Republic as a transition stage to the complete abolition of the State. The Communist International considers the dictatorship of the proletariat as the only means for the liberation of humanity from the horrors of capitalism.

The Communist International considers the Soviet form of government as the historically evolved form of this dictatorship of the proletariat." p. 4.

"Under the circumstances which have been created in the whole world, and especially in the most advanced, most powerful, most enlightened and freest capitalist countries by militarist imperialism—oppression of colonies and weaker nations, the universal imperialist slaughter, the 'peace' of Versailles—to admit the idea of a voluntary submission of the capitalists to the will of the majority of the exploited, of a peaceful, reformist passage to Socialism, is not only to give proof of an extreme petty bourgeois stupidity, but it is a direct deception of the workmen, a disguisal of capitalist wage-slavery, a concealment of the truth. This truth is that the bourgeoisie, the most enlightened and democratic portion of the bourgeoisie, is even now not stopping at deceit and crime, at the slaughter of millions of workmen and peasants, in order to retain the right of private ownership over the means of production. Only a violent defeat of the bourgeoisie, the confiscation of its property, the annihilation of the entire bourgeois governmental apparatus, parliamentary, judicial, military, bureaucratic, administrative, municipal, etc., even the individual exile or internment of the most stubborn and dangerous exploiters, the establishment of a strict control over them for the repression of all inevitable attempts at resistance and restoration of capitalist slavery—only such measures will be able to guarantee the complete submission of the whole class of exploiters." p. 11.

"That which before the victory of the proletariat seems but a theoretical difference of opinion on the question of 'democracy,' becomes inevitably on the morrow of the victory, a question which can only be decided by force of arms." p. 15.

"For all countries, even for most free 'legal' and 'peaceful' ones in the sense of a lesser acuteness in the class struggle, the period has arrived, when it has become absolutely necessary for every Communist party to join systematically lawful and unlawful work, lawful and unlawful organization." p. 18.

"It is especially necessary to carry on unlawful work in the army, navy, and police, as, after the imperialist slaughter, all the governments in the world are becoming afraid of the national armies, open to all peasants and workingmen, and they are setting up in secret all kinds of select military organizations recruited from the bour-geoisie and especially provided with improved technical equipment." p. 19.

"The class struggle in almost every country of Europe and America is entering the phase of civil war. Under such conditions the Communists can have no confidence in bourgeois laws. They should create everywhere a parallel illegal apparatus, which at the decisive moment should do its duty by the party, and in every way possible assist the revolution. In every country where, in consequence of martial law or of other exceptional laws, the Commu-nists are unable to carry on their work lawfully, a combina-tion of lawful and unlawful work is absolutely necessary." p. 28.

"A persistent and systematic propaganda and agitation is necessary in the army, where Communist groups should be formed in every military organization. Wherever, owing to repressive legislation, agitation becomes impos-sible, it is necessary to carry on such agitation illegally. But refusal to carry on or participate in such work should be considered equal to treason to the revolutionary cause, and incompatible with affiliation with the Third Interna-tional." p. 28.

"Each party desirous of affiliating with the Communist International should be obliged to render every possible assistance to the Soviet Republics in their struggle against all counter-revolutionary forces. The Communist parties should carry on a precise and definite propaganda to in-duce the workers to refuse to transport any kind of mili-tary equipment intended for fighting against the Soviet Republics, and should also by legal or illegal means carry on a propaganda amongst the troops sent against the workers' republics, etc." p. 30.

"The world proletariat is confronted with decisive bat-tles. We are living in an epoch of civil war. The criti-cal hour has struck. In almost all countries where there

is a labor movement of any importance the working class, arms in hand, stands in the midst of fierce and decisive battles. Now more than ever is the working class in need of a strong organization. Without losing an hour of invaluable time, the working class must keep on indefatigably preparing for the impending decisive struggle." p. 33.

"Until the time when the power of government will have been finally conquered by the proletariat, until the time when the proletarian rule will have been firmly established beyond the possibility of a bourgeois restoration, the Communist Party will have in its organized ranks only a minority of the workers. Up to the time when the power will have been seized by it, and during the transition period, the Communist Party may, under favorable conditions, exercise undisputed moral and political influence on all the proletarian and semi-proletarian classes of the population; but it will not be able to unite them within its ranks. Only when the dictatorship of the workers has deprived the bourgeoisie of such powerful weapons as the press, the school, parliament, the church, the government apparatus, etc.; only when the final overthrow of the capitalist order will have become an evident fact—only then will all or almost all the workers enter the ranks of the Communist Party." pp. 33–34.

"The working class cannot achieve the victory over the bourgeoisie by means of the general strike alone, and by the policy of folded arms. The proletariat must resort to an armed uprising." p. 36.

"As soon as Communism comes to light, it must begin to elucidate the character of the present epoch (the culminations of capitalism, imperialistic self-negation and self-destruction, uninterrupted growth of civil war, etc.). Political relationships and political groupings may be different in different countries, but the essence of the matter is everywhere the same: we must start with the direct preparation for a proletarian uprising, politically and technically, for the destruction of the bourgeoisie and for the creation of the new poletarian state.

"Parliament at present can in no way serve as the arena of a struggle for reform, for improving the lot of the work-

ing people, as it has at certain periods of the preceding epoch. The centre of gravity of political life at present has been completely and finally transferred beyond the limits of parliament. On the other hand, owing not only to its relationship to the working masses, but also to the complicated mutual relations within the various groups of the bourgeois itself, the bourgeoisie is forced to have some of its policies in one way or another passed through parliament, where the various cliques haggle for power, exhibit their strong sides and betray their weak ones, get themselves unmasked, etc., etc. Therefore it is the immediate historical task of the working class to tear this apparatus out of the hands of the ruling classes, to break and destroy it, and to create in its place a new proletarian apparatus. At the same time, however, the revolutionary general staff of the working class is vitally concerned in having its scouting parties in the parliamentary institutions of the bourgeoisie, in order to facilitate this task of destruction." pp. 44–45.

"Parliamentarism cannot be a form of proletarian government during the transition period between the dictatorship of the bourgeoisie and that of the proletariat. At the moment when the accentuated class struggle turns into civil war, the proletariat must inevitably form its State organization as a fighting organization, which cannot contain any of the representatives of the former ruling classes; all fictions of a 'national will' are harmful to the proletariat at that time, and a parliamentary division of authority is needless and injurious to it; the only form of proletarian dictatorship is a Republic of Soviets.

"The bourgeois parliaments, which constitute one of the most important apparatus of the State machinery of the bourgeoisie, cannot be won over by the proletariat any more than can the bourgeois order in general. The task of the proletariat consists in blowing up the whole machinery of the bourgeoisie, in destroying it, and all the parliamentary institutions with it, whether they be republican or constitutional-monarchical." pp. 45–46.

"Consequently, Communism repudiates parliamentarism as the form of the future; it renounces the same as a form of the class dictatorship of the proletariat; it repudiates the possibility of winning over the parliaments;

its aim is to destroy parliamentarism. Therefore it is only possible to speak of utilizing the bourgeois State organizations with the object of destroying them. The question can only and exclusively be discussed on such a plane.

"All class struggle is a political struggle, because it is finally a struggle for power. Any strike, when it spreads through the whole country, is a menace to the bourgeois State, and thus acquires a political character. To strive to overthrow the bourgeoisie, and to destroy its State, means to carry on political warfare. To create one's own class apparatus—for the bridling and suppression of the resisting bourgeoisie, whatever such an apparatus may be—means to gain political power." p. 46.

"The mass struggle means a whole system of developing demonstrations growing ever more acute in form, and logically leading to an uprising against the capitalist order of government. In this warfare of the masses developing into a civil war, the guiding party of the proletariat must, as a general rule, secure every and all lawful positions, making them its auxiliaries in the revolutionary work, and subordinating such positions to the plans of the general campaign, that of the mass struggle." p. 47.

"On the other hand, an acknowledgement of the value of parliamentary work in no wise leads to an absolute, in-all-and-any-case acknowledgement of the necessity of concrete elections and a concrete participation in parliamentary sessions. The matter depends upon a series of specific conditions. Under certain circumstances it may become necessary to leave the parliament. The Bolsheviks did so when they left the pre-parliament in order to break it up, to weaken it, and to set up against it the Petrograd Soviet, which was then prepared to head the uprising; they acted in the same way in the Constituent Assembly on the day of its dissolution, converting the Third Congress of Soviets into the centre of political events. In other circumstances a boycotting of the elections may be necessary, and a direct, violent storming of both the great bourgeois State apparatus and the parliamentary bourgeois clique, or a participation in the elections with a boycott of the parliament itself, etc.

"In this way, while recognizing as a general rule the necessity of participating in the election to the central parliament, and the institutions of local self-government, as well as in the work in such institutions, the Communist Party must decide the question concretely, according to the specific conditions of the given moment. Boycotting the elections or the parliament, or leaving the parliament, is permissible, chiefly when there is a possibility of an immediate transition to an armed fight for power." p. 49.

"A Communist delegate, by decision of the Central Committee, is bound to combine lawful work with unlawful work. In countries where the Communist delegate enjoys a certain inviolability, this must be utilized by way of rendering assistance to illegal organizations and for the propaganda of the party." p. 51.

"Each Communist member [of the legislature] must remember that he is not a 'legislator' who is bound to seek agreements with the other legislators, but an agitator of the Party, detailed into the enemy's camp in order to carry out the orders of the Party there. The Communist member is answerable not to the wide mass of his constituents, but to his own Communist Party—whether lawful or unlawful." p. 52.

"The propaganda of the right leaders of the Independents (Hilferding, Kautsky, and others), proving the compatibility of the Soviet 'system' with the bourgeois Constituent Assembly, is either a complete misunderstanding of the laws of development of a proletarian revolution, or a conscious deceiving of the working class. The Soviets are the dictatorship of the proletariat. The Constituent Assembly is the dictatorship of the bourgeoisie. To unite and reconcile the dictatorship of the working class with that of the bourgeoisie is impossible." p. 64.

"After the victory of the proletariat in the towns, this class [the landed peasants or farmers] will inevitably oppose it by all means, from sabotage to open armed counter-revolutionary resistance. The revolutionary proletariat must, therefore, immediately begin to prepare the necessary force for the disarmament of every single man of this class, and together with the overthrow of the capi-

204

talists in industry, the proletariat must deal a relentless, crushing blow to this class. To that end it must arm the rural proletariat and organize Soviets in the country, with no room for exploiters, and a preponderant place must be reserved to the proletarians and the semi-proletarians." p. 80.

"The revolutionary proletariat must proceed to an immediate and unconditional confiscation of the estates of the landowners and big landlords . . . No propaganda can be admitted in the ranks of the Communist parties in favor of an indemnity to be paid to the owners of large estates for their expropriation." p. 82.

Excerpts from Exhibit 8—THE STATE AND REVOLUTION, by Lenin (see note 13, *supra*):

"We have already said above and shall show more fully at a later stage that the teaching of Marx and Engels regarding the inevitability of a violent revolution refers to the capitalist State. It cannot be replaced by the proletarian State (the dictatorship of the proletariat) through mere 'withering away,' but, in accordance with the general rule, can only be brought about by a violent revolution. The hymn sung in its honor by Engels and fully corresponding to the repeated declarations of Marx (see the concluding passages of the Poverty of Philosophy and the Communist Manifesto, with its proud and open declaration of the inevitability of a violent revolution; also Marx's Criticism of the Gotha Program of 1875, in which, thirty years after, he mercilessly castigates its opportunist character)—this praise is by no means a mere 'impulse,' a mere declamation, or a mere polemical sally. The necessity of systematically fostering among the masses this and only this point of view about violent revolution lies at the root of the whole of Marx's and Engels' teaching, and it is just the neglect of such propaganda and agitation both by the present predominant Social-Chauvinists and the Kautskian schools that brings their betrayal of it into prominent relief.

"The substitution of a proletarian for the capitalist State is impossible without violent revolution, while the abolition of the proletarian State, that is, of all States, is only possible through 'withering away.'" pp. 15–16.

"The State is a particular form of organization of force; it is the organization of violence for the purpose of holding down some class. What is the class which the proletariat must hold down? It can only be, naturally, the exploiting class, i. e., the bourgeoisie. The toilers need the State only to overcome the resistance of the exploiters, and only the proletariat can guide this suppression and bring it to fulfilment—the proletariat, the only class revolutionary to the finish, the only class which can unite all the toilers and the exploited in the struggle against the capitalist class for its complete displacement from power." pp. 17–18.

"The doctrine of the class-war, as applied by Marx to the question of the State and of the Socialist revolution, leads inevitably to the recognition of the political supremacy of the proletariat, of its dictatorship, i. e., of an authority shared with none else and relying directly upon the armed force of the masses. The overthrow of the capitalist class is feasible only by the transformation of the proletariat into the ruling class, able to crush the inevitable and desperate resistance of the bourgeoisie, and to organize, for the new settlement of economic order, all the toiling and exploited masses.

"The proletariat needs the State, the centralized organization of force and violence, both for the purpose of guiding the great mass of the population—the peasantry, the lower middle-class, the semi-proletariat—in the work of economic Socialist reconstruction." pp. 18–19.

"But, if the proletariat needs the State, as a particular form of organization of force against the capitalist class, the question almost spontaneously forces itself upon us: Is it thinkable that such an organization can be created without a preliminary breaking up and destruction of the machinery of government created for its own use by the capitalist class? The Communist Manifesto leads us straight to this conclusion, and it is of this conclusion that Marx wrote summing up the practical results of the revolutionary experience gained between 1849 and 1851." p. 19.

"Hence Marx excluded England, where a revolution, even a people's revolution, could be imagined and was then possible, without the preliminary condition of the

destruction 'of the available ready machinery of the State.'

"Today, in 1917, in the epoch of the first great imperialist war, this distinction of Marx's becomes unreal, and England and America, the greatest and last representatives of Anglo-Saxon 'liberty,' in the sense of the absence of militarism and bureaucracy, have today completely rolled down into the dirty, bloody morass of military-bureaucratic institutions common to all Europe, subordinating all else to themselves. Today, both in England and in America, the 'preliminary condition of any real people's revolution' is the break-up, the shattering of the 'available ready machinery of the State' (perfected in those countries between 1914 and 1917, up to the 'European' general imperialist standard)." p. 26.

"But from this capitalist democracy—inevitably narrow, stealthily thrusting aside the poor, and therefore to its core, hypocritical and treacherous—progress does not march along a simple, smooth and direct path to 'greater and greater democracy,' as the Liberal professors and the lower middle class Opportunists would have us believe. No, progressive development—that is, towards Communism—marches through the dictatorship of the proletariat; and cannot do otherwise, for there is no one else who can break the resistance of the exploiting capitalists, and no other way of doing it.

"And the dictatorship of the proletariat—that is, the organization of the advance-guard of the oppressed as the ruling class, for the purpose of crushing the oppressors—cannot produce merely an expansion of democracy. Together with an immense expansion of democracy—for the first time becoming democracy for the poor, democracy for the people, and not democracy for the rich folk—the dictatorship of the proletariat will produce a series of restrictions of liberty in the case of the oppressors, exploiters, and capitalists. We must crush them in order to free humanity from wage-slavery; their resistance must be broken by force. It is clear that where there is suppression there must also be violence, and there cannot be liberty or democracy.

"Engels expressed this splendidly in his letter to Bebel when he said, as the reader will remember, that 'the pro-

letariat needs the State, not in the interests of liberty, but for the purpose of crushing its opponents; and, when one will be able to speak of freedom, the State will have ceased to exist.'

"Democracy for the vast majority of the nation, and the suppression by force—that is, the exclusion from democracy—of the exploiters and oppressors of the nation: this is the modification of democracy which we shall see during the transition from Capitalism to Communism." pp. 63–64.

"Again, during the transition from Capitalism to Communism, suppression is still necessary; but in this case it is the suppression of the minority of exploiters by the majority of exploited. A special instrument, a special machine for suppression—that is, the 'State'—is necessary, but this is now a transitional State, no longer a State in the ordinary sense of the term. For the suppression of the minority of exploiters by the majority of those who were but yesterday wage slaves, is a matter comparatively so easy, simple and natural that it will cost far less bloodshed than the suppression of the risings of the slaves, serfs or wage laborers, and will cost the human race far less." pp. 64–65.

Mr. Justice Jackson:

I do not participate in this decision. This case was instituted in June of 1939 and tried in December of that year. In January 1940, I became Attorney General of the United States and succeeded to official responsibility for it. 309 U. S. iii. This I have considered a cause for disqualification, and I desire the reason to be a matter of record.